UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
AT MILWAUKEE

_____

JERRY SMITH JR.,

                  Plaintiff,

v.

CITY OF MILWAUKEE,
EDWARD A. FLYNN, MILWAUKEE
COUNTY CHIEF OF POLICE,
POLICE OFFICER JOHN DOE #1,                Case No. 18-CV-
POLICE OFFICER JOHN DOE #2 and
POLICE OFFICERS JOHN DOE #3-10,

                  DEFENDANTS.

_____/

## FEDERAL COMPLAINT WITH JURY DEMAND

NOW COME the above-named Plaintiff, JERRY SMITH JR., by his attorney, WALTER W. STERN III, and for their causes of action against the above-named DEFENDANTS, Plaintiff alleges and shows claims for relief as follows:

## INTRODUCTION

1.    This is a federal civil rights action under the Fourth and Fourteenth Amendments to the Constitution of the United States and Title 42 of the United States Code, Section 1983. PLAINTIFF brings this action to obtain compensatory damages, punitive damages, attorneys' fees, costs and equitable relief for the serious personal injuries resulting of JERRY SMITH JR., who was unlawfully subjected to excessive force when he was shot twice on August 31, 2017 by the DEFENDANTS, POLICE OFFICER JOHN DOE #1, and POLICE OFFICER JOHN DOE #2. The conduct of the DEFENDANTS and the constitutional violations suffered by JERRY SMITH JR. occurred as a direct result of the unconstitutional policies of the City of

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 1 of 40   Document 1

Milwaukee, Milwaukee Police Department and their agents, and the use of excessive force by said unknown Milwaukee Police Officers.

## JURISDICTION AND VENUE

Jurisdiction

2.  This action arises under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. Jurisdiction of the Court is conferred by Title 28 of the United States Code, Sections 1331 and 1343(a)(3) and (4).

Venue

3.  The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 of the United States Code, Section 1391 (b), because it is the judicial district where the constitutional rights violations of JERRY SMITH JR. were committed.

## PARTIES

Plaintiff

4.  That Plaintiff, JERRY SMITH JR., at all times material hereto, has been a permanent resident in the City of Milwaukee, State of Wisconsin and has attained the age of majority.

Defendants

5.  That Defendant the City of Milwaukee ("MILWAUKEE"), at all times material hereto, was a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at City Hall, 200 East Wells Street, Room 205, City of Milwaukee, State of Wisconsin, 53202.

6.  That Defendant, EDWARD A. FLYNN ("FLYNN"), at all times relevant hereto, is the City of Milwaukee Chief of Police, and said Chief of Police is responsible for the management and carrying out of the activities of Milwaukee Police Officers, all acting under color of State law, as herein set forth, and participated and agreed in the policies, practices and procedures leading to excessive force and violation of the 4th and 14th Amendments to the United States Constitution, and the due process clause of the 14th Amendment to the United States Constitution, in that he agreed, approved, and promoted policies which led to excessive force, contrary to the 4th and 14th Amendments to the United States Constitution, as alleged herein.

7.  That DEFENDANT POLICE OFFICER JOHN DOE #1 and POLICE OFFICER JOHN DOE #2, at all times material hereto, were adult residents of the City of Milwaukee, State of Wisconsin, and were Milwaukee Police Department ("MPD") officers employed by MILWAUKEE. That, at all times material hereto, POLICE OFFICER JOHN DOE #1 and POLICE OFFICER JOHN DOE #2 were acting under color of law, were carrying out their duties as MPD officers and were acting within the scope of their employment with MILWAUKEE.

8.  That Defendant POLICE OFFICERS JOHN DOE #3-10, at all times material hereto, were adult residents of the City of Milwaukee, State of Wisconsin, and were Milwaukee Police Department ("MPD") officers employed by MILWAUKEE.

9.  That, at all times material hereto, POLICE OFFICERS JOHN DOE #3-10 were acting under color of state law, were carrying out their duties as MPD officers and were acting within the scope of their employment with MILWAUKEE.

# FACTS

<u>MILWAUKEE's Unconstitutional Policies</u>

10.  Since 2008, Defendant MILWAUKEE, through the MPD, has engaged in an unlawful policy, practice, and custom of conducting a high-volume, suspicionless stop-and-frisk program. This program authorizes MPD officers to stop people without objective and articulable reasonable suspicion of criminal conduct, and to frisk people without reasonable suspicion that the person is armed and dangerous, as required under the Fourth Amendment. Under this program, the MPD also conducts pervasive stops and frisks that are motivated by race and ethnicity in violation of the Fourteenth Amendment and Title VI.

11.  The MPD's unconstitutional, suspicionless stop-and-frisk program was adopted as part of a so-called "broken windows" policing strategy purportedly devised to deter crime. The strategy includes blanketing certain geographic areas in which residents are predominantly people of color with "saturation patrols" by MPD officers, who conduct high-volume, suspicionless stops and frisks throughout the area. Over time, the MPD's program has developed into a formal and informal quota system that requires patrol officers to meet numerical targets for stops on a regular basis.

12.  As a result, the combined number of MPD traffic and pedestrian stops skyrocketed from just 66,657 in 2007 to 196,434 in 2015 – a staggering, nearly threefold, increase.

13.  Overwhelmingly, the victims of the MPD's suspicionless stop-and-frisk program are Black and Latino people. Though implemented citywide, the MPD's program has been largely concentrated in neighborhoods of color, including Milwaukee

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 4 of 40   Document 1

Police Districts Three, Five, and Seven, all of which are located in predominantly African-American neighborhoods in the northern half of the City.

14. In addition, data reflect that African-American and Latino people are more likely than white people to be stopped and frisked throughout Milwaukee, including in mixed-race and predominantly white neighborhoods. A 2011 Milwaukee Journal Sentinel analysis of MPD traffic stop data found that Black drivers citywide were seven times more likely—and that Hispanic drivers were five times more likely—to be targeted for a traffic stop than white drivers. Moreover, African-American, non-Hispanic individuals comprised 72% of the targets of MPD stops conducted between 2010 and 2012 that were documented in an MPD database, even though, according to U.S. Census figures, they only made up an estimated 34% of the City's total population at the time.

15. The MPD's high-volume, suspicionless stop-and-frisk program has created and deepened public fear of and alienation from the MPD, particularly among African-American and Latino residents. African-American and Latino people throughout Milwaukee – including children – fear that they may be stopped, frisked, or otherwise treated like criminal suspects when doing nothing more than walking to a friend's house or home from school, driving to and from the homes of loved ones, running errands, or simply taking a leisurely walk or drive through the City. No matter where they are in the City, African-American and Latino people face the constant fear that they and their children may be subjected to police harassment even if they are doing nothing wrong. That there is a long, tragic history of a widespread pattern of constitutional violations committed by MPD officers.

16. That some famous names in MILWAUKEE history, including, but not limited to, Daniel Bell, Ernest Lacy, Tandy O'Neal, Justin Fields, Curtis Harris, Frank L. Jude, Jr., Wilbert Prado and Derek Williams, were victims of constitutional rights violations committed by MPD officers, leading to serious injuries and/or death.

17. That these unconstitutional policies and procedures are violative of the Fourth and Fourteen Amendments against unlawful arrests, confinement, and seizure.

18. That one of the latest victims of the widespread pattern of constitutional rights violations committed by MPD officers is JERRY SMITH JR., who suffered an unlawful stop and attempted arrest which resulted in the use of excessive force.

19. That the moving force behind the widespread pattern of constitutional violations committed by MPD officers, including the violations suffered by JERRY SMITH JR., are the unconstitutional policies of MILWAUKEE including: (a) the deficient hiring and retention policy; (b) the failure to train policy; (c) the failure to discipline policy; and (d) the custom of condoning constitutional rights violations.

20. That the FIRE AND POLICE COMMISSION (FPC) and MPD Chief of Police are the policy-makers for MILWAUKEE with respect to the discipline of MPD officers.

21. That MILWAUKEE has a long history of failing to discipline its police officers for misconduct, including, but not limited to, the commission of constitutional rights violations.

22. That the policies of MILWAUKEE with respect to its failures to discipline MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by JERRY SMITH JR.

23.    That MILWAUKEE had actual and/or constructive notice that MPD officers were unlawfully detaining individuals prior to August 31, 2017.

24.    That, despite having actual and/or constructive notice that MPD officers were unlawfully detaining individuals, MILWAUKEE took no action to cease such unlawful conduct of discipline the MPD officers involved.

25.    That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unlawfully detaining individuals, MILWAUKEE allowed the unlawful detentions to continue, including the unlawful arrest suffered by JERRY SMITH JR.

26.    That MILWAUKEE had actual and/or constructive notice that MPD officers were unreasonably arresting and searching individuals prior to August 31, 2017.

27.    That, despite having actual and/or constructive notice that MPD officers were unreasonably searching individuals, MILWAUKEE took no action to discipline the MPD officers involved.

28.    That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unreasonably arresting and searching individuals, MILWAUKEE allowed the unreasonable arrests and searches to continue, including the unreasonable arrest suffered by JERRY SMITH JR.

29.    That MILWAUKEE had actual and/or constructive notice that MPD officers were using excessive force against individuals prior to August 31, 2017.

30.    That, despite having actual and/or constructive notice that MPD officers were using excessive force against individuals, MILWAUKEE took no action to discipline the MPD officers involved.

31. That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in using excessive force against individuals, MILWAUKEE allowed the uses of excessive force to continue, including the use of excessive force suffered by JERRY SMITH JR.

32. That the DEFENDANTS unlawfully detained, unreasonably searched, and used excessive force against JERRY SMITH JR. because, prior to August 31, 2017, other MPD officers had not been disciplined for similar misconduct.

33. That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

34. That, if MILWAUKEE had not historically and consistently failed to discipline MPD officers for unlawful detentions, unreasonable searches and uses of excessive force, the unlawful detention, unreasonable search, and the use of excessive force suffered by JERRY SMITH JR. would not have happened.

35. That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

Custom of Condoning Constitutional Rights Violations

36. That, prior to August 31, 2017 and continuing to the present, MILWAUKEE maintained a custom of condoning constitutional rights violations by MPD officers.

37. That this custom of condoning constitutional rights violations by MPD officers was/is so persistent and widespread that it is the official policy of MILWAUKEE.

38. That prior to August 31, 2017, MILWAUKEE had actual and/or constructive notice of the custom of condoning constitutional rights violations by MPD officers.

39. That the American Civil Liberties Union, (ACLU) has filed a federal civil rights action against the City of Milwaukee and Milwaukee Police Department, alleging constitutional violations and deprivations, now pending in the Eastern District of Wisconsin, which is annexed hereto and incorporated herein by reference.

40. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was the failure to discipline MPD officers for misconduct, as set forth in the preceding paragraphs.

41. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers is the "code of silence" that exists within the MPD, even though this code may be contrary to the express policies of MILWAUKEE.

42. That the MPD's "code of silence" means that MPD officers do not report the misconduct of their fellow officers due to the fear of retaliation.

43. That MILWAUKEE has taken no action with respect to any MPD officer following the "code of silence" by refusing to testify in civil or criminal proceedings.

44. That in 2009, FLYNN admitted that the "code of silence" existed within the MPD.

45. That the "code of silence" presently exists within the MPD and is currently the custom and policy of MILWAUKEE.

46. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers is the concept of *"noble cause corruption"* that exists within the MPD, even though this concept may be contrary to the express policies of MILWAUKEE.

47. That the concept of "noble cause corruption" is where MPD officers engage in misconduct because they believe they are accomplishing a greater good.

48. That in 2012, FLYNN admitted that the concept of "noble cause corruption" exists within the MPD.

49. That MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was the moving force behind the constitutional violations suffered by JERRY SMITH JR.

50. That the constitutional violations suffered by JERRY SMITH JR. happened as a result of the named DEFENDANTS following the concept of "noble cause corruption," engaging in unlawful detentions, unreasonable searches and uses of excessive force, because they believed that such actions would serve the greater good of the community.

51. That had MILWAUKEE not maintained a custom of condoning constitutional violations, the constitutional violations suffered by JERRY SMITH JR. would not have occurred.

Widespread Pattern of Constitutional Violations

52. That there is a long history of constitutional violations committed by MPD officers that were a direct result of the policies and customs of MILWAUKEE. That the constitutional violations include, but are not limited to, the events listed below.

53. That, in 1958, MPD Officer Thomas Grady planted a knife on Daniel Bell to support his false claim that Mr. Bell was armed and attacked him.

54. That MPD Officer Louis Krause followed the MPD's "code of silence" by conspiring with MPD Officer Thomas Grady to lie about the incident which led to the fatal shooting of Daniel Bell.

55. That between 1979 and 1980, the United States Department of Justice ("DOJ") conducted an investigation into a possible pattern of misconduct within the MPD.

56. That former MPD Chief of Police Harold Brier refused to cooperate with the DOJ investigation.

57. That the DOJ investigation found that 22 people died in MPD custody between 1975 and 1979.

58. That the DOJ investigation ultimately determined that there was no accountability for former MPD Chief of Police Harold Brier.

59. That in 1981, Ernest Lacy died in MPD custody after MPD officers used excessive force against him and then failed to provide him with medical assistance.

60. That, despite a medical examiner documenting over 30 cuts and bruises on Ernest Lacy's body, and witnesses' accounts describing MPD officer use of excessive force against Mr. Lacy, former MPD Chief of Police Harold Brier claimed that MPD officers did nothing wrong during the incident that resulted in the death of Mr. Lacy.

61. That former MPD Chief of Police Harold Brier refused to cooperate with any federal investigation into the death of Ernest Lacy.

62. That in 1988, MPD officers shot Tandy O'Neal in the back, rendering Mr. O'Neal a quadriplegic.

63. That a MPD Detective, following the MPD's "code of silence," initially stated that Tandy O'Neal struggled with MPD officers prior to being shot.

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 11 of 40   Document 1

64. That the MPD Detective eventually admitted that his statement regarding Tandy O'Neal struggling with MPD officers was not true.

65. That in 2003, MPD Officer Craig Nawotka shot and killed Justin Fields.

66. That MPD Officer Craig Nawotka shot Justin Fields in the back as Mr. Fields was slowly driving away from MPD officers.

67. That MPD Sergeant Harold Hampton, who conducted the MPD internal investigation into MPD Officer Craig Nawotka's shooting of Justin Fields, testified under oath that the head of the MPD internal affairs division ignored Sergeant Hampton's findings that Officer Nawotka violated several MPD rules during the incident that resulted in the shooting of Mr. Fields.

68. That MILWAUKEE settled a civil rights action filed by the family of Justin Fields for $1.6 million.

69. That also in 2003, MPD Officer Kevin Clark slammed Curtis Harris' head into the wall and floor of the MPD District 3 Police Station booking room. MPD Officer Kevin Clark claimed that Curtis Harris was trying to hit him, but video from the incident refuted Officer Clark's claim.

70. That, as a result of MPD Officer Kevin Clark's actions, Curtis Harris was rendered a quadriplegic.

71. That MILWAUKEE settled a federal civil rights action filed by Curtis Harris for $3 million.

72. That MILWAUKEE took no action against MPD Officer Kevin Clark for his actions during the incident with Curtis Harris.

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 12 of 40   Document 1

73. That MPD Officer Kevin Clark was later fired from the MPD after he pleaded guilty to insurance fraud after collecting worker's compensation benefits for injuries he sustained while sledding on duty.

74. That MPD Officer Kevin Clark and other MPD officers followed the MPD's "code of silence" by covering up the sledding while on duty incident.

75. That, although they initially denied any involvement in the incident regarding Frank L. Jude, Jr., several MPD officers ultimately pled guilty in federal court to violating Frank L. Jude, Jr. 's constitutional rights.

76. That, following a federal criminal trial, a jury determined that several other MPD officers violated Frank L. Jude, Jr. 's constitutional rights.

77. That MILWAUKEE settled Frank L. Jude, Jr. 's federal civil rights action for $2 million.

78. In March 2005, MPD Officer Alfonzo Glover shot and killed Wilbert Prado.

79. That, following the trial on the Prado family's federal civil rights action, a jury determined that MPD Officer Alfonzo Glover violated Wilbert Prado's constitutional rights.

80. That MIILWAUKEE ultimately settled the Prado family's federal civil rights action.

81. That in 2012, MPD Sergeant Jason Mucha was reassigned after multiple complaints of invasive body cavity searches.

82. That within a three-year time period, Sergeant Mucha was accused at least ten times of using excessive force and/or planting drugs on citizens.

83. That in August 2005, the Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr. presiding, ruled that several persons who had accused Sergeant Mucha of using excessive force could testify in a criminal case where the defendant accused Sergeant Mucha of using excessive force. See, *State of Wisconsin v. Lemar Barnes*, Milwaukee County Case Number 04-CF-1001, Amended Decision of Admissibility of Evidence, dated August 10, 2005.

84. That on March 14, 2006, the Court of Appeals of Wisconsin issued an opinion reversing a trial court decision that denied a criminal defendant's request to introduce evidence that Sergeant Mucha had used excessive force and/or planted drugs on other persons. *State of Wisconsin v. Walter T. Missouri*, 2006 WI App 74.

85. That between 2000 and 2007, the MPD investigated Sergeant Mucha for seven battery complaints, four unreasonable search complaints, two theft complaints and one false arrest complaint.

86. That the MPD claimed that all the complaints against Sergeant Mucha set forth in the preceding paragraph were either unfounded or unsubstantiated.

87. That the MPD either failed to notice or intentionally disregarded a pattern and/or trend with respect to Sergeant Mucha's misconduct.

88. That on July 6, 2011, Derek Williams died in MPD custody after MPD officers may have used excessive force against Mr. Williams, and then failed to provide Mr. Williams with medical assistance, despite the fact that Mr. Williams was in the back seat of an MPD squad car struggling to breathe and begging MPD officers for help.

89. That an Inquest was held to determine whether any of the MPD officers involved should face criminal charges as a result of the death of Derek Williams.

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 14 of 40   Document 1

90. That following the conclusion of testimony, the Derek Williams Inquest jury issued an advisory verdict that MPD Officers Richard Ticcioni, Jason Bleichwehl and Jeffrey Cline should be criminally charged pursuant to Wisconsin Statute Section 940.291, Law Enforcement Officer; Failure to Render Aid.

91. That despite the Derek Williams Inquest jury's advisory verdict, the special prosecutor who conducted the Inquest refused to bring criminal charges against Officers Ticcioni, Bleichwehl and Cline.

92. That MILWAUKEE took no action against Officers Ticcioni, Bleichwehl, Cline, or any other MPD officers involved in the death of Derek Williams.

93. That on September 22, 2011, MPD Officer Richard Schoen used excessive force against a woman in his custody by punching her in the face multiple times, grabbing her by the hair as he removed her from an MPD squad car, and kneeing her in the stomach.

94. That the MPD fired Officer Schoen as a result of his actions on September 22, 2011.

95. That the FPC then reversed the MPD's decision to fire Officer Schoen and instead gave him his job back, suspending him for 60 days.

96. That following a public outcry, the FPC reinstated the MPD's decision to fire Officer Schoen.

97. That in 2013, a jury determined that MPD Detective Rodolfo Gomez either intentionally, or with reckless disregard for the truth, made false or misleading statements in an affidavit accompanying a search warrant application, awarding the victim of Detective Gomez's misconduct $1,000,000. See *Richard Betker v.*

*Rodolfo Gomez*, United States District Court for the Eastern District of the United States Case Number 08-CV-760, Verdict Form dated November 20, 2013.

98.  That from approximately 2008 to 2012, several MPD officers conducted illegal pat-down searches, illegal strip searches and illegal body cavity searches of numerous individuals.

99.  That over 70 individuals alleged federal civil rights claims against the MPD officers for the illegal pat-down searches, illegal strip searches and illegal body cavity searches.

100. That MILWAUKEE settled the individuals' federal civil rights claims involving the illegal pat-down searches, illegal strip searches and illegal body cavity searches for $5 million.

101. That on August 31, 2017, DEFENDANTS JOHN DOE #1 and JOHN DOE #2 were on bicycle patrol in and about the neighborhood between Wisconsin Avenue and Well Street, between 27th Street and elsewhere.

102. That at approximately noon on August 31, 2017, while patrolling in and around Wells Street, Milwaukee, Wisconsin, JOHN DOE #1 and JOHN DOE #2, did respond to an undefined altercation at or around 29th and Wells, involving what appeared to be young, black males and at least one female in front of an apartment building arguing.

103. That upon approaching the individuals on their MPD Patrol Bicycles, the individuals began to scatter, including the Plaintiff.

104. That upon approaching JERRY SMITH JR., JOHN DOE #1 had his hand on his sidearm, causing JERRY SMITH JR. to fear for his safety and Plaintiff fled south, pursued by JOHN DOE #1 and JOHN DOE #2.

105. That JERRY SMITH JR. eventually climbed stairs immediately adjacent to a single-story parking garage at 29th and Wisconsin Avenue.

106. That JOHN DOE #1 and JOHN DOE #2 pursued JERRY SMITH JR. onto the rooftop, with their large caliber handguns drawn and pointed at JERRY SMITH JR., while JOHN DOES #3-10 surrounded the perimeter of the garage from the street.

107. That JERRY SMITH JR. was clearly visible to JOHN DOE #1 and JOHN DOE #2, as he stood on the Northeast corner of the roof, while holding a cellphone to his ear and attempting to call his family members.

108. That one or more of JOHN DOES #3-10 had a clear field of vision of JERRY SMITH JR. from the ground and could see that Plaintiff was not armed with any weapon whatsoever.

109. That JOHN DOE #1 and JOHN DOE #2 ordered JERRY SMITH JR. to turn around.

110. That when Plaintiff complied with the orders from JOHN DOE #1 and JOHN DOE #2, both DEFENDANTS, without justification, opened fire on JERRY SMITH JR.

111. That the high caliber bullets from the handguns of DEFENDANTS JOHN DOE #1 and JOHN DOE #2 struck JERRY SMITH JR. in the lower right quadrant of his abdomen and the right side of his head.

112. That JOHN DOE #1 and JOHN DOE #2 never saw JERRY SMITH JR. with a weapon, yet critically wounded him, causing life threatening injuries and without the consent of JERRY SMITH JR.

113. That upon being shot by JOHN DOE #1 and JOHN DOE #2 on August 31, 2017, Plaintiff, before collapsing, questioned JOHN DOE #1 and JOHN DOE #2 as to why they had shot him.

114. That the shooting of JERRY SMITH JR. by JOHN DOE #1 and JOHN DOE #2 was witnessed and videotaped by at least one onlooker.

115. That the video of the shooting of JERRY SMITH JR. by JOHN DOE #1 and JOHN DOE #2, clearly demonstrates that JERRY SMITH JR. had no weapon, and had made no threats or furtive gestures to provoke JOHN DOE #1 and JOHN DOE #2 to shoot him.

116. That immediately after shooting the JERRY SMITH JR., JOHN DOE #1 and JOHN DOE #2 searched JERRY SMITH JR. and his immediate area for a weapon, but recovered only a cellphone, which JERRY SMITH JR. was using when shot by JOHN DOE #1 and JOHN DOE #2.

117. That JERRY SMITH JR., having been critically wounded by JOHN DOE #1 and JOHN DOE #2, did lay on the roof of the garage until paramedics came to his aid and subsequently transported him to the Froedtert Trauma Clinic in Milwaukee, where he underwent emergency surgery to his abdomen.

118. That JERRY SMITH JR., as a result of being shot by DEFENDANTS JOHN DOE #1 and JOHN DOE #2, lost part of his lower intestine.

119. That as a result of being shot by DEFENDANTS JOHN DOE #1 and JOHN DOE #2, JERRY SMITH JR. has a large caliber bullet lodged within his pelvic region, which struck bone, causing fragments and left him partially paralyzed in his right leg, along with numbness and his ability to ambulate normally.

120. That on August 31, 2017, DEFENDANTS did unlawfully arrest and detain the Plaintiff, shackling Plaintiff to his Intensive Care Hospital bed, had armed Milwaukee Police officers standing 24-hour watch, and generally treated JERRY SMITH JR. as a prisoner in the hospital, despite their being no charges levying against him.

121. That the DEFENDANTS, jointly and severally, have maintained an official policy within the Milwaukee Police Department, which precludes attorneys from visiting clients while in the Milwaukee City Jail and, in JERRY SMITH JR.'s case, to the hospital bed where he lay shackled. See, **Attachment "A"** annexed hereto and incorporated herein by reference.

122. That the DEFENDANTS, jointly and severally, after being formally advised that counsel had been retained on behalf of JERRY SMITH JR. and requesting admission to his hospital room for an attorney-client interview, did deny counsel's access to the client, together with holding JERRY SMITH JR. incommunicado at the hospital. See, **Attachment "B"** annexed hereto and incorporated herein by reference.

123. That the DEFENDANTS, jointly and severally, did hold JERRY SMITH JR. as a prisoner for a period of five (5) consecutive days, all while shackled to the hospital bed.

124. That JERRY SMITH JR. was never charged with any criminal activity associated to the events prior to his being shot by JOHN DOE #1 and JOHN DOE #2 on August 31, 2017.

125. That as a direct or proximate result of being shot by JOHN DOE #1 and JOHN DOE #2, JERRY SMITH JR. suffers and will likely continue to suffer repeated pain, mental anguish, loss of use of mobility, numbness, partial paralysis, future medical treatment, therapy and the effects of the physical trauma JERRY SMITH JR. sustained at the hands of JOHN DOE #1 and JOHN DOE #2.

126. That JERRY SMITH JR. suffers and will likely continue to suffer Post-Traumatic Stress Disorder, as a direct or proximate result of being shot by JOHN DOE #1 and JOHN DOE #2 on August 31, 2017.

127. That JERRY SMITH JR. incurred past medical and hospital expenses and will require future medical care for the injuries he sustained by the DEFENDANTS' actions on August 31, 2017.

## CAUSES OF ACTION

### First Cause of Action

Title 42, United States Code, Section 1983 Unlawful Arrest & Detention against DEFENDANTS

128. JERRY SMITH JR. re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

129. That JERRY SMITH JR. had a constitutionally protected right not to be unlawfully detained, arrested and shot.

130. That, as set forth in the preceding paragraphs, these DEFENDANTS unlawfully detained, arrested and shot JERRY SMITH JR.

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 20 of 40   Document 1

131. That the DEFENDANTS acted under color of state law.

132. That the DEFENDANTS' unlawful detention and arrest resulted in the shooting of JERRY SMITH JR.

133. The above acts and omissions of all DEFENDANTS, and each of them, constitute a course of conduct and failure to act amounting to willful, wanton and deliberate indifference to the rights, health, safety, and welfare of JERRY SMITH JR. resulting in the deprivation of his constitutional rights, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause to the United States Constitution.

134. The acts and omissions of the DEFENDANTS, as set forth above, violated the clearly established and well settled federal constitutional rights of JERRY SMITH JR., i.e., due process of law under the Fourteenth Amendment to the United States Constitution, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, because each and every DEFENDANT, individually and jointly, were deliberately indifferent to the rights of JERRY SMITH JR.

135. That the actions and activities of each of the above-named DEFENDANTS, with the exception of MILWAUKEE, were malicious and/or reckless, and done with deliberate indifference, justifying an award of punitive damages as determined by the Jury.

## Second Cause of Action

Title 42, United States Code, Section 1983 Unreasonable Search against the DEFENDANTS

136. JERRY SMITH JR. re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

137. That JERRY SMITH JR. had a constitutionally protected right to be free from unreasonable searches and seizures.

138. That, as set forth in the preceding paragraphs, the named DEFENDANTS deprived JERRY SMITH JR. of his constitutionally protected right to be free from unreasonable searches and seizures.

139. That the DEFENDANTS intentionally caused the deprivation of JERRY SMITH JR.'s right to be free from unreasonable searches and seizures.

140. That the DEFENDANTS acted under color of state law.

141. That the DEFENDANTS' unreasonable search resulted in the shooting of JERRY SMITH JR.

142. The above acts and omissions of all DEFENDANTS, and each of them, constitute a course of conduct and failure to act amounting to willful, wanton and deliberate indifference to the rights, health, safety, and welfare of JERRY SMITH JR. resulting in the deprivation of his constitutional rights, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause to the United States Constitution.

143. The acts and omissions of the DEFENDANTS, as set forth above, violated the clearly established and well settled federal constitutional rights of JERRY SMITH JR., i.e., due process of law under the Fourteenth Amendment to the United States Constitution, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, because each and every

DEFENDANT, individually and jointly, were deliberately indifferent to the rights of JERRY SMITH JR.

144. That the actions and activities of each of the above-named DEFENDANTS, with the exception of MILWAUKEE, were malicious and/or reckless, and done with deliberate indifference, justifying an award of punitive damages as determined by the Jury.

**<u>Third Cause of Action</u>**

Title 42, United States Code, Section 1983 Excessive Force against the DEFENDANTS

145. JERRY SMITH JR. re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

146. That JERRY SMITH JR. had a constitutionally protected right not to have excessive force used against him.

147. That, as set forth in the preceding paragraphs, the DEFENDANTS used excessive force against JERRY SMITH JR.

148. That the DEFENDANTS intentionally used excessive force against JERRY SMITH JR.

149. That the DEFENDANTS acted under color of state law.

150. That the DEFENDANTS' use of excessive force resulted in the shooting of JERRY SMITH JR.

151. The above acts and omissions of all DEFENDANTS, and each of them, constitute a course of conduct and failure to act amounting to willful, wanton and deliberate indifference to the rights, health, safety, and welfare of JERRY SMITH JR. resulting in the deprivation of his constitutional rights, pursuant to the Eighth and

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 23 of 40   Document 1

Fourteenth Amendments to the United States Constitution and the Due Process Clause to the United States Constitution.

152. The acts and omissions of the DEFENDANTS, as set forth above, violated the clearly established and well settled federal constitutional rights of JERRY SMITH JR., i.e., due process of law under the Fourteenth Amendment to the United States Constitution, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, because each and every Defendant, individually and jointly, were deliberately indifferent to the rights of JERRY SMITH JR.

153. That the actions and activities of each of the above-named DEFENDANTS, with the exception of MILWAUKEE, were malicious and/or reckless, and done with deliberate indifference, justifying an award of punitive damages as determined by the Jury.

**Fourth Cause of Action**
Title 42, United States Code, Section 1983 Denial of Right to Counsel

154. Plaintiff re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

155. That the conduct and policy of the DEFENDANTS, as set forth in the preceding paragraphs, resulted in the denial of Plaintiff's right to counsel.

156. The above acts and omissions of all DEFENDANTS, and each of them, constitute a course of conduct and failure to act amounting to willful, wanton and deliberate indifference to the rights, health, safety, and welfare of JERRY SMITH JR. resulting in the deprivation of his constitutional rights, pursuant to the Eighth and

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 24 of 40   Document 1

Fourteenth Amendments to the United States Constitution and the Due Process Clause to the United States Constitution.

157. The acts and omissions of the DEFENDANTS, as set forth above, violated the clearly established and well settled federal constitutional rights of the Plaintiffs, i.e., due process of law under the Fourteenth Amendment to the United States Constitution, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, because each and every Defendant, individually and jointly, were deliberately indifferent to the rights of JERRY SMITH JR.

158. That the actions and activities of each of the above-named DEFENDANTS, with the exception of MILWAUKEE, were malicious and/or reckless, and done with deliberate indifference, justifying an award of punitive damages as determined by the Jury.

**Fifth Cause of Action**
Wisconsin Statute Section 895.46 Indemnification against MILWAUKEE

159. JERRY SMITH JR. re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

160. That at all times material hereto, the DEFENDANTS were carrying out their duties as a MPD officer or agents of the Milwaukee Police, and were acting within the scope of their employment with MILWAUKEE.

161. That the conduct of the DEFENDANTS, as set forth in the preceding paragraphs, resulted in the shooting of JERRY SMITH JR.

162. That MILWAUKEE is liable, pursuant to Wisconsin Statute Section 895.46, for any judgment entered against the DEFENDANTS in this action because, at all times material hereto, the DEFENDANTS were carrying out their duties as an MPD officers or agents, and were acting within the scope of their employment with MILWAUKEE.

**Sixth Cause of Action**
Title 42, United States Code, Section 1983
Deficient Hiring and Continued Employment Policy against MILWAUKEE

163. JERRY SMITH JR. re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

164. That at all material times hereto, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

165. That prior to 2005, MILWAUKEE had an official policy with respect to the hiring and continued employment of MPD officers.

166. That prior to 2005, MILWAUKEE's policy makers made a conscious choice to follow its official policy with respect to the hiring and continued employment of MPD officers, despite various alternatives.

167. That prior to 2005, MILWAUKEE's official policy with respect to the hiring and continued employment of MPD officers was deficient in that it did not include administration of complete psychological testing of police officer candidates.

168. That prior to 2005 and continuing to the present, MILWAUKEE's policy-makers permitted the hiring of certain MPD officers, even though complete psychological testing would lead an objectively reasonable person to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 26 of 40   Document 1

third parties of their constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

169. That MILWAUKEE knew, or should have known, as more fully set forth in the preceding paragraphs, that complete psychological testing of police officer candidates was needed to avoid highly likely deprivations of constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

170. That MILWAUKEE's deficient policy with respect to the hiring and continued employment of MPD officers caused the violation of JERRY SMITH JR.'s constitutional rights, and were a direct cause of the injuries and damages to JERRY SMITH JR., as set forth in the preceding paragraphs.

171. That MILWAUKEE's official policy with respect to the hiring of MPD officers may be currently deficient in that it does not include administration of complete psychological testing of police officer candidates.

172. That DEFENDANT FLYNN condoned all the unconstitutional policies alleged above and was Chief of Police for the City of Milwaukee at the time of the underlying incident.

**Seventh Cause of Action**
Title 42, United States Code, Section 1983 Failure to Train Policy against MILWAUKEE

173. JERRY SMITH JR. re-alleges, and incorporate by reference, the allegations in the preceding paragraphs.

174. That at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

175. That prior to August 31, 2017, and continuing to the present, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policies with respect to the training of MPD officers.

176. That, as set forth in the preceding paragraphs, prior to August 31, 2017 and continuing to the present, MILWAUKEE's official policies with respect to the training of MPD officers were inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

177. That prior to August 31, 2017 and continuing to the present, the policy-makers of MILWAUKEE knew or should have known that more and/or different training of MPD officers with respect to: (a) encountering individuals who are suffering from mental illness and/or experiencing a crisis situation; (b) dealing with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation; and (c) using force against individuals was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policy-makers of MILWAUKEE.

178. That MILWAUKEE's failure to provide adequate training to MPD officers caused the violations of JERRY SMITH JR.'s constitutional rights, and the injuries and damages to JERRY SMITH JR., as set forth in the preceding paragraphs.

179. That MILWAUKEE's official policies with respect to the training of MPD officers are currently inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

**Eighth Cause of Action**
Title 42, United States Code, Section 1983 Failure to Discipline Policy against MILWAUKEE

180. JERRY SMITH JR. realleges. and incorporate by reference, the allegations in the preceding paragraphs.

181. That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

182. That, prior to August 31, 2017, and continuing to the present, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policies with respect to the discipline of MPD officers.

183. That prior to August 31, 2017 and continuing to the present, as set forth in the preceding paragraphs, MILWAUKEE's official policies with respect to the discipline of MPD officers were inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

184. That prior to August 31, 2017 and continuing to the present, the policy makers of MILWAUKEE knew or should have known that more and/or different policies with respect to the discipline of MPD officers were needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this should have been plainly obvious to MILWAUKEE.

185. That MILWAUKEE's failure to discipline MPD officers caused the violations of JERRY SMITH JR.'s constitutional rights, and the resultant injuries and damages, as set forth in the preceding paragraphs.

186. That MILWAUKEE's official policies with respect to the discipline of MPD officers are currently inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

187. The above acts and omissions of all DEFENDANTS, and each of them, constitute a course of conduct and failure to act amounting to willful, wanton and deliberate indifference to the rights, health, safety, and welfare of JERRY SMITH JR. resulting in the deprivation of his constitutional rights, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause to the United States Constitution.

188. The acts and omissions of the DEFENDANTS, as set forth above, violated the clearly established and well settled federal constitutional rights of the Plaintiffs, i.e., due process of law under the Fourteenth Amendment to the United States Constitution, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, because each and every Defendant, individually and jointly, were deliberately indifferent to the rights of JERRY SMITH JR.

189. That the actions and activities of each of the above-named DEFENDANTS, with the exception of MILWAUKEE, were malicious and/or reckless, and done with deliberate indifference, justifying an award of punitive damages as determined by the Jury.

## Ninth Cause of Action
Title 42, United States Code, Section 1983
Custom of Condoning Constitutional Rights Violations against MILWAUKEE

190. JERRY SMITH JR. re-alleges, and incorporate by reference, the allegations in the preceding paragraphs.

191. That at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

192. That the actions and/or inactions of the DEFENDANTS in unlawfully detaining, unreasonably searching, and using excessive force against JERRY SMITH JR. were done in accordance with MILWAUKEE's custom of condoning constitutional rights violations.

193. That MILWAUKEE's custom of condoning constitutional rights violations is so persistent and widespread, as set forth in the preceding paragraphs, that it is MILWAUKEE's de facto official policy.

194. That MILWAUKEE's custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the actions and/or inactions of the DEFENDANTS, all in malicious or reckless disregard, and with deliberate indifference regarding the constitutional rights of JERRY SMITH JR.

195. That the policy makers of MILWAUKEE made a conscious choice to follow its custom of condoning constitutional rights violations.

196. That the policy makers of MILWAUKEE acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 31 of 40   Document 1

197. That MILWAUKEE's custom of condoning constitutional rights violations caused the violations of JERRY SMITH JR.'s constitutional rights, and his resultant injuries and damages, as set forth in the preceding paragraphs.

**Tenth Cause of Action**

198. JERRY SMITH JR. repeats and realleges, and incorporate by reference, the allegations of the preceding paragraphs.

199. That the unnamed JOHN DOE police officers detaining JERRY SMITH JR. for five (5) days after his shooting, shackling him to the hospital bed, constitutes cruel and unusual punishment, as a pretrial detainee, contrary to the Due Process Clause of the Fourteen Amendment to the Constitution, and an illegal seizure, contrary to the Fourth and Fourteenth Amendments to the United States Constitution.

200. That the deliberate indifference alleged in this claim caused JERRY SMITH JR., pain, suffering, anxiety, PTSD, and physical injuries due to the inhumane conditions; being guarded by the police officers, and shackled to the bed, causing additional damages as more fully alleged in the previous paragraphs.

201. That each and every DEFENDANT acted under color of state law within their jurisdiction, and during the course of employment.

202. That said conduct of the DEFENDANTS, jointly and severally, was done recklessly and/or maliciously, justifying an award of punitive damages.

203. That the policies and proceedings contained in Attachment A and B denied JERRY SMITH JR. of the right to counsel and violated his constitutional right to remain silent for the five (5) days of his unlawful confinement in the hospital, contrary to

the Sixth and Fourteenth Amendments to the United States Constitution, all causing additional damages as alleged in the previous paragraphs.

204. That as to each and every cause of action, First through Tenth, as a proximate result of the DEFENDANTS, jointly and severally, violated the aforesaid constitutional rights said JERRY SMITH JR. suffered, past and future medical expense; pain, suffering, and disability past, present and future; and permanent wage loss.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the DEFENDANTS as follows:

    a. In favor of the Plaintiff and against the DEFENDANTS, as set forth in the preceding paragraphs, jointly and severally, for compensatory and special damages;

    b. In favor of the Plaintiff and against the DEFENDANTS, as set forth in the preceding paragraphs, for punitive damages;

    c. In favor of the Plaintiff and against Defendant MILWAUKEE, as set forth in preceding paragraphs, for its liability pursuant to Wisconsin Statute Section 895.46;

    d. For injunctive and other equitable relief imposing a decree preventing the unconstitutional practice outlined in this complaint; and

    e. For all costs, disbursements, interest and reasonable attorneys' fees pursuant to Title 42 of the United States Code, Section 1988, and for such other relief as the Court deems just and equitable.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS ACTION

Dated this 27th day of January 2018.

By:   *electronically signed by Walter W. Stern III*
       WALTER W. STERN III
       Counsel for PLAINTIFF
       920 85th Street, Unit 123
       Kenosha, WI  53143
       (262) 880-0192/(262) 997-1101
       wstern1@wi.rr.com

# Attachment

## "A"

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 35 of 40   Document 1



**ATTY. WALTER W. STERN, III**
Bar No. 1014060
P.O. Box 351
Kenosha WI 53141-0351
**Phone:** (262) 880-0192
**Email:** wstern1@wi.rr.com

To:     MILWAUKEE POLICE DEPARTMENT
        DISTRICT THREE
        Sgt. Harmon

        MPD METRO DIVISION
        Capt. Steven Caballero
        Lt. Casper

Re:     JERRY SMITH JR.                            September 4, 2017


        This is to advise you that we have been retained by Mr. Smith's family to represent him. We hereby advise you and any other law enforcement officers or agents to cease and refrain from any questioning Mr. Smith, without my being present.

        This Notice is delivered and being faxed to 414-935-7113, District Three. And Lt. Casper, Metro Division, at 414-935-7122.

        Lt. Casper advises that Mr. Smith will not be allowed ANY visitors, including counsel, as if at the City Jail. Lt. Casper further advises that Mr. Smith can be seen at the County Jail in a day or two. Lt. Casper also informs that Mr. Smith retains the right to counsel and can waive that right if he so desires and that he didn't "start doing this job yesterday and we can litigate it later in court".

        It should be noted that Mr. Smith has been held incommunicado since being shot in the head, while being interrogated and investigated by MPD as a result of the shooting.


                                        **WALTER W. STERN III**


Cc:     File

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 36 of 40   Document 1

HP Officejet Pro 8630 Series                    Fax Log for

                                                Sep 04 2017 10:39AM

**Last Transaction**

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| | | | | Digital Fax | | |
| Sep 4 | 10:38AM | Fax Sent | 4149357113 | 0:37<br>N/A | 1 | OK |

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 37 of 40   Document 1

# Attachment

# "B"



# MILWAUKEE POLICE DEPARTMENT

**STANDARD OPERATING PROCEDURE**

090 – PRISONERS AND BOOKING

| | | |
|---|---|---|
| **GENERAL ORDER:** 2015-55<br>**ISSUED:** November 30, 2015 | **EFFECTIVE:** November 30, 2015 | **REVIEWED/APPROVED BY:**<br>Captain Mark Stanmeyer<br>**DATE:** November 13, 2015 |
| **ACTION:** Amends General Order 2015-18 (May 4, 2015) | | **WILEAG STANDARD(S):** 1.7.4., 1.7.5, 7.1.1, 7.1.2, 7.1.3, 7.1.4, 7.1.5, 7.1.6, 7.1.7, 7.1.8, 7.1.9, 7.1.10, 7.2.1, 7.2.2, 7.2.3, 7.2.4, 7.2.5, 7.2.6, 7.2.7, 7.2.8, 7.2.9, 7.2.10, 7.2.11, 7.2.12, 7.2.13, 7.2.14, 7.2.15, 7.2.16, 7.2.17, 7.2.18, 7.2.19, 7.2.20, 7.2.21, 7.3.1, 7.3.2, 7.3.3, 7.3.4, 7.3.5, 7.3.6, 7.3.7, 7.3.8, 13.1.1 |

### 090.00  PURPOSE

The purpose of this standard operating procedure is to establish guidelines for the control, care, transport, and processing of prisoners at Milwaukee Police Department temporary holding facilities.

### 090.02  TEMPORARY HOLDING FACILITY ADMINISTRATOR (WILEAG 7.2.3)

A. The Temporary Holding Facility (THF) Administrator shall be appointed by the Chief of Police.

B. The THF Administrator or designee shall exercise authority over all temporary holding facilities, detention and interrogation rooms, prisoner processing, safety, security, care and monitoring of all prisoners, subject to the orders of the Chief of Police.

   1. The THF Administrator shall oversee training for personnel assigned to duties at the temporary holding facilities, operations, supervision and physical restraint of prisoners, and other responsibilities consistent with the position.

   2. The THF Administrator shall oversee transfer and transportation of prisoners to and from THF facilities and other jails.

   3. Ensure that Central Booking personnel conduct regular and periodic inspections of all department THF facilities for compliance with department policies and procedures, state of Wisconsin jail codes, and federal regulations relative to temporary holding facilities.

   4. File an annual report to the Chief of Police detailing the results of state of Wisconsin and/or federal inspections as all department THF facilities must be inspected and approved by the Department of Corrections on an annual basis.

   5. Routinely review all mandates, procedures, standards, and correspondence from any agency that regulates temporary holding facilities so that policies and

Case 2:18-cv-00143-WED   Filed 01/28/18   Page 39 of 40   Document 1

information in packages prepared by department personnel. The completed PA-45 and CR-215 shall accompany prisoners taken to CJF.
(WILEAG 1.7.4.4)

1. In-state warrants shall be confirmed with the Milwaukee County Sheriff's Department or the originating agency (ORI). The warrant information shall be included in the prisoner's package.

2. Out of state felony warrants

   - Out of state felony warrants must be confirmed through Investigative Management Division (IMD) clerical support staff. The confirmation teletype is to be included in the prisoner package that is taken to CJF. A copy of the confirmation teletype, arrest report and positive hit sheet must be faxed to the IMD - Extradition Unit.

   - The Extradition Unit will obtain a copy of the warrant from the ORI and complete the extradition process.

090.160 PRISONER VISITORS AT A DISTRICT STATION OR CENTRAL BOOKING (WILEAG 7.2.21)

A. Department members requesting to enter a temporary holding facility or interview any prisoner confined therein shall first receive authorization from the respective shift commander of said facility.

B. No visitors, except for attorneys, shall be allowed a personal interview with a prisoner. Any visitor interested in speaking to a prisoner shall be referred to the Criminal Justice Facility (CJF) once the prisoner has been transferred there.

C. When an attorney requests to interview a prisoner who is in MPD custody, the shift commander of the respective investigations division in which the arrest occurred shall be notified. Attorney visits are at the discretion of the shift commander of the respective investigations division in which the arrest occurred and are not required to be granted. If granted, the prisoner shall be brought to a proper place in the facility where the prisoner may consult with counsel and shall at all times be properly guarded from escape.

090.165 TELEPHONE REQUESTS

Generally, prisoners requesting a telephone to contact friends, relatives, or counsel shall be permitted the use of a telephone following their arrival at the Criminal Justice Facility (CJF). However, shift commanders may allow a prisoner in custody for a misdemeanor or a municipal violation the use of a telephone. A prisoner in custody for a felony may be allowed the use of a telephone with the approval of the respective investigations division shift commander. If any such request is granted, bookers shall dial the number for the prisoner and record the prisoner's name, date, time and number called in their memo book.