# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JERRY SMITH, JR.,**
      **Plaintiff,**

     v.                                    Case No. 18-C-0143

**MELVIN FINKLEY, et al.,**
      **Defendants.**

---

## DECISION AND ORDER

Jerry Smith, Jr., brings this action under 42 U.S.C. § 1983 for excessive force against two City of Milwaukee police officers, Melvin Finkley and Adam Stahl. Before me now is the defendants' motion for summary judgment.[1]

## I. BACKGROUND

On the afternoon of August 21, 2017, someone called the police and reported that men were fighting in front of an apartment building on West Wells Street in the City of Milwaukee. Police officers were sent to the scene, but by the time they arrived, the men had dispersed. Fifteen to thirty minutes later, two men returned to the scene of the fight. Again, someone called the police, and this person reported that the men were armed with guns. This time, Officers Robert Ferrell and Matthew Wenzel (who are not defendants) were dispatched to respond. At the time, these officers were patrolling the area on bicycles. The dispatcher informed them that the armed men were black males in their twenties, one of whom was wearing a white tank top and the other of whom was

---

[1] Smith had previously asserted claims against the defendants and unknown City of Milwaukee police officers for unlawful arrest and detention, denial of his right to counsel, and denial of due process. However, Smith has abandoned those claims and does not oppose entry of summary judgment on them. *See* Br. in Opp. at 2, ECF No. 38.

wearing a black tank top. The dispatcher also informed them about the fight that had been reported earlier. Officer Wenzel inferred that the armed men likely returned to the scene of the fight to retaliate for whatever had happened earlier.

As Wenzel and Ferrell approached the scene, they saw two black males who matched the description of the men with guns. Intending to conduct a field interview, the officers approached the men. When the men saw the officers, they immediately crossed the street. The officers followed the men and asked them to stop. The man in the white tank top stopped. The other individual, who was later identified as the plaintiff, Jerry Smith, Jr., rapidly walked away. In their affidavits, Officers Ferrell and Wenzel state that they saw a bulky item about six inches long in the left-hand pocket of Smith's jogging pants. The item was L-shaped and boxy, and Smith appeared to need to use his whole hand to cover it while he walked away. Based on these observations, the officers concluded that Smith had a gun in his pants pocket and was the subject of the citizen call for assistance. Smith, however, states that the only items in his pocket were a cellphone and a pair of dice.

Officer Wenzel radioed for assistance and said that he and his partner were pursuing the man with a gun. For a brief time, the officers lost sight of Smith. They turned into an alley behind a large apartment building on West Wisconsin Avenue and spent a few minutes looking for him. They found a staircase on the west side of a one-story parking structure located behind the apartment building. The officers climbed the stairs and looked over the roof of the parking structure. Two cube-shaped air-conditioning units were on the roof; they were several feet apart from each other. One was near the west side of the roof; the other was near the east side. The officers could

see a moving shadow being cast from behind the western unit, which was the one nearest to the officers. Realizing that Smith was hiding behind that unit, the officers ordered him to show his hands, keep his hands out of his pockets, and come towards them.

Smith got up from his hiding spot, but instead of coming over to the officers, he began pacing around on the east side of the roof, which was the side farthest from the officers. The officers did not see a gun, but they thought he might still have one on him or that he might have placed one behind the air-conditioning unit. They continued to command Smith to show his hands and surrender, but he did not comply.

Meanwhile, the defendants, Officers Finkley and Stahl, were on patrol in an unmarked squad car and received the dispatch about the men with guns. As they arrived at the apartment building on West Wells Street, they received a new dispatch indicating that other officers had pursued a subject with a gun and had discovered him hiding on a rooftop behind an apartment building on West Wisconsin Avenue. The officers proceeded to that location. They parked their car and ran down the alley to where Officers Wenzel and Ferrell and other responding officers were located.

Very shortly after Finkley and Stahl arrived at the scene, they ran up the stairs to where Wenzel and Ferrell were located. One of these officers told Finkley and Stahl that they did not see a gun in Smith's hand but that he had been hiding behind an air-conditioning unit. Finkley understood this to mean that Smith may have placed a gun near the air-conditioning unit. Finkley and Stahl then immediately climbed onto the west side of the roof and pointed their weapons at Smith, who was near the east side. The officers began moving across the roof towards Smith. The officers noticed the air-

conditioning units, which were three-feet wide and waist-high. As they were climbing onto the roof, Finkley and Stahl heard other officers shouting commands at Smith. Once Finkley and Stahl were on the roof and had their guns drawn, Officer Stahl shouted commands at Smith such as "show me your hands" and "turn around." Smith states that he heard one of the officers command him to get down on the ground. Smith Dep. at 99, ECF No. 38-1 at p. 11 of 11.

    Officer Finkley and Stahl were wearing body cameras that recorded what happened next. The recordings show that, a few seconds after Finkley and Stahl came onto the roof with guns drawn, Smith took a couple of steps and showed them his empty hands by raising them about waist-high and spreading his palms. He then bent forward at the waist, as if he were complying with an order to lie face-down on the ground. The officers immediately shot Smith three times in rapid succession as he was bending forward. Finkley shot first and third; while Stahl fired the second shot. From the vantage point of Stahl's camera, it looks like Smith was about four feet behind the eastern air-conditioning unit when he began to bend forward towards the ground in front of the unit. However, the air-conditioning unit was between Finkley and Smith; thus, from Finkley's vantage point, it is hard to tell how close Smith was to the unit. Finkley states that he believed Smith "lunged" towards the unit. However, Finkley's body-camera footage does not show Smith lunging. Instead, it shows him with his hands spread at the waist and then slowly lowering them as he begins bending forward. He appears to be extending his hands towards the ground in front of him in order to lie face-first on the ground when Finkley shoots. Finkley also states that, before he fired, he heard Smith say something like, "What are you going to do, shoot me?"

4

Officer Finkley states that he decided to shoot Smith because he thought Smith was reaching for a gun located near the base of the air-conditioning unit, which he could have used to shoot at Finkley, Stahl, or the officers and citizens located in the alley below. Officer Stahl states that Smith was dark-skinned and standing in a shadow cast by nearby trees, which made it difficult for him to determine whether Smith's hands were empty. He states that after he heard Finkley's first shot, he concluded that Smith must have had a gun and had shot at Finkley. Stahl therefore fired a single shot at Smith to protect Finkley.

After the officers shot Smith, he fell to the ground on the rooftop. The officers approached Smith and determined that he did not have a weapon. They and the other officers on the scene attended to Smith while they waited for paramedics to arrive. Smith was taken to a hospital for treatment. One of the bullets struck Smith's pelvis. He alleges that he is now partially paralyzed in his right leg and suffers from numbness and an inability to ambulate normally. Am. Compl. ¶ 24.

In bringing this action, Smith seeks damages under 42 U.S.C. § 1983 for his injuries. He contends that Officers Finkley and Stahl acted unreasonably in using deadly force against him, and that therefore they violated his rights under the Fourth Amendment. The defendants move for summary judgment. They contend that their use of deadly force was reasonable and that they are entitled to qualified immunity.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the

light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Claims of excessive force, including deadly force, are evaluated under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386,393–94 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–12 (1985). The court considers whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others. *Sanzone v. Gray*, 8884 F.3d 736, 740 (7th Cir. 2018). If the suspect threatens the officer with a weapon, deadly force may be used. *Id.* But it is well-established that a person has a right not to be seized through the use of deadly force unless he puts another person, including a police officer, in imminent danger. *See Williams v. Ind. State Police Dep't.*, 797 F.3d 468, 484 (7th Cir. 2015).

Given the above standards, the issue before me is whether a reasonable jury could find that Officers Finkley and Stahl lacked probable cause to believe that, at the time they used deadly force, Smith posed an immediate threat to their safety or to the safety of others. I conclude that it could. As discussed above, the body camera footage appears to show that Smith was in the process of surrendering at the time he was shot. Smith had just raised his hands waist-high and showed that his palms were empty. He then slowly lowered his hands and began bending forward, apparently intending to lie face-first on the ground. He did not lunge or make other threatening movements. Even if the footage does not conclusively show that Smith was surrendering, it would at least be reasonable for a jury to conclude that Officers Finkley and Stahl used deadly force

6

against Smith without probable cause to believe that he posed a threat to someone's safety.

When the body camera footage is considered along with all other evidence in this case, it is still possible for a jury to reasonably conclude that Finkley and Stahl unreasonably used deadly force. Finkley states that he believed Smith was lunging for a weapon, but the footage does not support his claim that Smith was lunging. Instead, the footage shows Smith slowly bending forward. Finkley also states that Smith said, "What are you going to do, shoot me?" but a jury would not be compelled to conclude that this statement was threatening.

Although Stahl states that he thought Smith had a gun, his camera shows Smith standing with two empty hands immediately before the officers began shooting. Stahl claims that the shadow from the trees made it difficult to tell whether Smith held a gun, but a jury could reasonably conclude from Stahl's body camera footage that Smith's hands were clearly empty. The officers also state that Smith was acting erratically and had disobeyed their orders to surrender. However, the footage shows that Finkley and Stahl were on the roof for only about ten seconds before they started shooting. In that time, Smith walked a short distance across the roof—parallel to the officers rather than towards them—and then showed his empty hands. The footage does not show Smith behaving erratically while Finkley and Stahl were present. Smith did pace around the roof before Finkley and Stahl arrived, while other officers were present, but the other officers did not inform Finkley and Stahl that Smith had been pacing and behaving erratically before they climbed onto the roof. Moreover, it would be reasonable for a jury to conclude that Smith was trying to comply with the officers' orders when they shot him.

It is true that Smith did not obey the officers' orders to "turn around"—Smith instead tried to "get on the ground." But a jury that sees the footage could reasonably conclude that the officers should have recognized Smith's gestures of showing his hands and then slowly bending forward towards the ground as acts of surrender. Thus, viewing the evidence in the light most favorable to Smith, I conclude that a jury could find that the officers lacked justification to use deadly force.

In reaching this conclusion, I am cognizant of the difficult task facing law enforcement officers called to address situations such as the one presented in this case. *See Williams*, 797 F.3d at 473. I recognize that the reasonableness of an officer's actions must be assessed from the perspective of a reasonable officer on the scene, not based on the "20/20 vision of hindsight," and that officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving situations. *Id.* (quoting *Graham*, 490 U.S. at 396). Still, even after accounting for these factors, I must conclude that a jury could reasonably return a verdict for Smith. Although Finkley and Stahl had to make split-second decisions about whether Smith had access to a gun and was about to fire on them, the footage does not show Smith engaging in threatening acts. While a jury could find that Finkley and Stahl acted reasonably in the heat of the moment, such a finding is not compelled. Thus, the defendants are not entitled to summary judgment on the issue of the reasonableness of their use of deadly force.

The defendants assert that they are entitled to qualified immunity. "Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force . . . because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively

8

unreasonable for the officer to believe that the force was lawful—*i.e.*, they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was clearly established." *Williams*, 797 F.3d at 473 (quoting *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir.2013)). For qualified immunity purposes, a right is clearly established if the contours of that right are sufficiently clear that a reasonable officer would understand that his actions violate that right. *Id.*

Here, Officer Finkley contends that he is entitled to qualified immunity because "no case law precludes an officer's decision to use deadly force when he perceives that a suspect is reaching for a gun to fire at officers or others nearby." Br. in Supp. at 32–33, ECG No. 30. Officer Stahl contends that he is entitled to qualified immunity for similar reasons, namely, because he perceived that Smith moved towards Officer Finkley and fired a gun at him, and no case law precludes the use of deadly force in such circumstances. *Id.* at 34. However, as explained above, when the evidence is viewed in the light most favorable to Smith, it does not show that Officer Finkley perceived that Smith was reaching for a gun at the time he was shot. Nor does it show that Stahl reasonably believed that Smith had a gun and had shot at Finkley. Rather, a jury could reasonably find that both Finkley and Stahl shot an unarmed man who was in the process of surrendering. As noted above, it has been clearly established since long before the shooting here that a person has a right not to be seized through the use of deadly force unless he puts another person in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force. *Williams*, 797 F.3d at 484. Because a jury could find that the officers did not have probable cause to

believe that Smith had put them or others in imminent danger, the officers are not entitled to qualified immunity.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the plaintiff's claims for unlawful arrest and detention, denial of his right to counsel, and denial of due process. The motion is denied as to the plaintiff's claims against Finkley and Stahl for excessive force.

Dated at Milwaukee, Wisconsin, this 7th day of April, 2020.

<span style="text-align:right">s/Lynn Adelman<br>LYNN ADELMAN<br>United States District Judge</span>