In the

# United States Court of Appeals
## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

---

No. 20-1754

JERRY SMITH, JR.,

*Plaintiff-Appellee,*

*v.*

MELVIN FINKLEY and
ADAM STAHL,

*Defendants-Appellants.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-00143 — **Lynn Adelman**, *Judge.*

---

ARGUED DECEMBER 7, 2020 — DECIDED AUGUST 18, 2021

---

Before SYKES, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Jerry Smith, Jr. reportedly left the scene of a fight and returned with a gun. After a citizen complained, two Milwaukee police officers on patrol came upon Smith and saw that he matched the description relayed by dispatch. When the officers approached Smith to investigate, he fled. The officers followed, believing Smith was armed.

Smith was found hiding on a rooftop one block away, and when the pursuing officers discovered him, an intense and dangerous standoff took place. After Smith refused numerous orders to cooperate, two other officers—Melvin Finkley and Adam Stahl, the defendants here—approached Smith, and believing he was armed, drew their guns. What followed is disputed: the officers thought Smith was reaching down behind an air conditioning unit for a gun, and Smith said he was responding to an earlier command to get down on the ground. Finkley and Stahl shot Smith three times. He survived but with serious injuries. Video from the officers' body cameras captured these events.

Smith sued under 42 U.S.C. § 1983 and alleged excessive force in violation of the Fourth Amendment. The officers moved for summary judgment, arguing that their use of force was reasonable as a matter of law and that qualified immunity shielded them from liability. After the district court denied the officers' motion, they filed this interlocutory appeal of the denial of qualified immunity. In this posture, appellate jurisdiction is limited: we can resolve an abstract legal question, but not factual disputes that are important to and inseparable from the qualified immunity defense.

As we must, we consider this court's jurisdiction in view of Smith's claim of unreasonable use of deadly force and the officers' qualified immunity defense. That assessment, from the perspective of a reasonable officer on the scene, evaluates whether the totality of the circumstances justified seizure by shooting. Some of those circumstances weighed in favor of the police using deadly force to seize Smith. But in the short time frame before and when the officers shot Smith, factual disputes exist about how much of a threat Smith posed and

how actively he was resisting. The qualified immunity decision depends upon and cannot be separated from these disputes, which are integral to the merits of Smith's claim. Because we cannot resolve these factual disputes, we dismiss this appeal for lack of jurisdiction.

## I.

### A.

As in many qualified immunity cases, the factual record plays a critical role in our review of the district court's decision. Our account of the facts comes from the evidence submitted on the defendants' summary judgment motion, construed in Smith's favor. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). That evidence includes videos from the body cameras of three of the officers involved. These videos overlap in time and place and show the same events from different perspectives.

Although we view the facts in the light most favorable to the nonmovant on summary judgment, qualified immunity precedent provides that a factual account is not to be credited if it is "blatantly contradicted" by the video evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "This is because on summary judgment we view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott*, 550 U.S. at 378–81). When video "firmly settles a factual issue," we will not "indulge stories clearly contradicted by the footage" because there is no genuine factual dispute. *Horton*, 883 F.3d at 944. "Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations." *Id.* "A conclusive video allows a court to know what happened

and decide the legal consequences," but a video that is ambiguous or "not wholly clear" can be relied on only for those facts that can be established "with confidence" and "beyond reasonable question." *Johnson v. Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019).

## B.

Now to the facts, which occurred in Milwaukee on August 31, 2017, at approximately 1:00 p.m. The events here unfolded in three stages: (1) bicycle officers approached Smith who ran away; (2) believing Smith was armed, the bicycle officers followed and found him one block away on the roof of a parking garage; and (3) after a standoff the defendant officers approached Smith on the roof and shot him.

### 1. Smith's interaction with bicycle officers

City of Milwaukee uniformed police officers Robert Ferrell and Matthew Wenzel (who are not defendants here) were patrolling on bicycles. In response to a citizen complaint of two men with guns, the officers reported to an apartment building at 2922 West Wells Street in Milwaukee. Dispatch told them there had been a fight near the building, and that police were sent to respond, but those involved had dispersed. The officers also learned that 15 to 30 minutes after the fight, a citizen reported that the two men had returned with guns.

Arriving on the scene, Ferrell and Wenzel encountered two men walking west on the 2800 block of West Wells Street who matched the descriptions from the dispatch. Wenzel's body camera video depicts the officers' interactions with these two men. Smith does not dispute he was one of the men, although he maintains he returned to retrieve his cell phone, which had fallen to the ground during the earlier fight. When

the officers asked the men to stop and talk, one stopped, but the other—later identified as Jerry Smith—walked rapidly away from the officers while talking on his phone. He then ran south on 29th Street.

Before Smith ran, the officers observed a bulky, L-shaped object about six inches long in his left pants pocket. While running away, Smith was seen using his left hand to cover and hold the object in place. Wenzel's video depicts this, although a gun is not visible in the video. Based on his 22 years' experience as an officer, along with how the object looked and how Smith appeared to be holding it, Wenzel thought Smith possessed a gun. Ferrell concluded the same. For his part, Smith testified that as he ran from the two bicycle officers, he heard a man he knew as "Chris" scream to the officers that Smith had a gun.

From these events, the officers concluded that Smith was one of the subjects of the earlier dispatch. On their bicycles, Ferrell and Wenzel chased Smith on 29th Street towards Wisconsin Avenue. But Ferrell lost sight of Smith as he turned into an alley that runs behind a different apartment building at 2905 West Wisconsin Avenue. Wenzel caught up with Ferrell, and for a few minutes they looked for Smith in yards and behind fences adjacent to the alley.

### 2. On the roof behind 2905 West Wisconsin Avenue

The back of the apartment building faces south and includes a one-story parking garage accessible from the alley. A staircase on the west side of the garage allows access to the roof.

Ferrell and Wenzel climbed the staircase. At the top, they were able to see out onto the rectangular roof, which was

bordered on three sides with a short perimeter wall. The fourth side, to the officers' left, is formed by the wall of the apartment building. The officers observed two cube-shaped air conditioning (AC) units, each waist high, set about twenty feet apart, one after the other and parallel to the building.

Wenzel, as he told Ferrell at the time, hesitated to step onto the roof because he believed Smith had a gun. While scanning the roof from the staircase, the officers noticed a shadow moving behind the AC unit closer to them. The shadow was cast by Smith, who was hiding behind that unit.

Smith peeked out. The officers saw him, and from the staircase, they pointed their service weapons at Smith. They yelled a series of commands, including "show your hands" and "get over here and we won't shoot." As the officers shouted to Smith, he walked away from them toward the far end of the roof. Smith says he complied with the officers' commands, but the video clearly contradicts this. At one point, Smith showed his hands with the right holding a black phone. Wenzel's video shows that Smith moved his hands toward his pockets several times, and Wenzel and Ferrell repeatedly shouted at Smith not to do so. For about ninety seconds, Wenzel and Ferrell ordered Smith to come to them and to get off the roof—repeating these commands approximately 25 to 30 times. Smith did not comply. With their guns pointed at Smith, the officers remained on the staircase.

Although Wenzel's body camera audio does not clearly capture the exchange, Wenzel attested that Smith said he did not have a weapon. Wenzel responded to Smith that was good and that he would not get hurt, but that he should come over to the officers. Wenzel believed that Smith still had a gun on

his person, or that he had placed a gun behind one of the AC units.

Meanwhile, Smith continued to walk around on the roof. He repeatedly put his hands up and then down towards his pockets. The officers kept shouting commands to Smith including "get your hands out of your pockets," "walk over here now," and "you want this to go good, you come here now." At one point, Smith stood still and looked around for approximately thirty seconds. During that standstill, Wenzel and Ferrell say they believed Smith was trying to decide whether to fight the officers or to flee from the rooftop.

The officers' body camera videos captured Wenzel telling Smith: "This is a no-win situation—get over here and get on the ground." Wenzel gave this order approximately 25 seconds before the shooting.[1]

### 3. Finkley and Stahl arrive and the shooting

Officers Finkley and Stahl received the same dispatch as Ferrell and Wenzel about two men with guns at 29th and West Wells Streets. Finkley and Stahl drove to that location, and citizens pointed to where the two men went. They then received a second dispatch that other officers had pursued an armed man who had been discovered hiding on the roof of the parking garage behind 2905 West Wisconsin Avenue. They quickly drove there, ran down the alley, saw other police officers, and then went to the stairs on the west side of the parking garage.

When Finkley and Stahl arrived, Wenzel and Ferrell were standing on the stairs to the roof with their weapons pointed

---

[1] Stahl's body camera audio also picked up that order as Finkley and Stahl moved up the staircase to the roof.

at Smith. Finkley asked "how we looking?" and Stahl asked "do you want us to go up?" They were told "he's up on the roof." Finkley then asked if "he got the gun in his hand?" and Ferrell told Finkley and Stahl that "he doesn't have a gun in his hand but he was hiding behind the AC unit."

At this point, Finkley and Stahl believed that Smith possessed a gun or had immediate access to one, although they had not seen Smith with a gun in his hand. Smith testified he did not have a gun that day, though he admitted knowing the officers thought he had a gun.

As Finkley and Stahl climbed from the stairs onto the roof, Ferrell yelled "put your hands in the air—do it now!"[2] Finkley described Smith as "fidgety" and Stahl described Smith as "nervous and fidgety." With their weapons drawn, Finkley and Stahl walked quickly toward Smith, who was standing by the far edge of the roof past the second AC unit. Finkley walked closer to the building wall and Stahl walked to Finkley's right. Stahl then yelled to Smith "Get your hands in the air—do it now—turn around, turn around."

Smith walked toward the northeast corner of the roof. He first faced the officers with his hands by his sides, then with them stretched out parallel to the ground empty palms facing out. The officers concluded Smith had disregarded their commands, but Smith said he complied with their orders. Finkley attested he heard Smith say something like "what are you going to do, shoot me?", although that statement was not recorded. Smith then stepped toward Finkley.

---

[2] The audio of Wenzel's and Stahl's body cameras captured these commands. Finkley's body camera did not record the audio until 28 seconds into the encounter, after the shots were fired.

The parties dispute what happened next. Finkley says Smith suddenly bent at his waist and lunged toward the back side of the far AC unit, which was between Smith and Finkley. Stahl, who was to Finkley's right, says he saw Smith move toward Finkley. Smith testified that after he showed his hands, he told the officers he did not have a gun. According to Smith, he "turned to lay on my stomach to get put in handcuffs." Smith disputes that he lunged and says he leaned toward the ground trying to follow the officers' instructions to "get down."

The two officers then fired three shots at Smith in quick succession. As Smith moved downward, Finkley shot first. Then Stahl shot second, and Finkley shot third. Finkley's video shows Smith bending forward with the AC unit between them. The perspective from Stahl's video is somewhat different. It shows a greater distance between Smith and the back of the AC unit, and Smith bending forward toward the rooftop. Per the officers' body camera videos, Smith was hit with the bullets in the head and the pelvis.

As Smith was hit with bullets, he fell to the ground. Finkley went to Smith and determined that he was not armed. The officers searched but they did not find a gun on the roof. Smith was taken to the hospital and survived the gunshot wounds. Doctors removed part of his lower intestine, and a bullet that struck his pelvis remains lodged there, leaving him partially paralyzed in his right leg and unable to walk normally.

For temporal context, approximately eight minutes elapsed between Ferrell and Wenzel first encountering Smith on Wells Street and the shooting. The time between Ferrell and Wenzel seeing Smith's shadow on the roof and the

shooting was approximately 1 minute 40 seconds. Finkley and Stahl arrived on the staircase 20 seconds before the shooting and they were on the roof for about ten seconds before they shot Smith.

As Milwaukee police officers, Finkley and Stahl are trained that when approaching any situation, they should consider that it might result in the use of force, and they should apply their training, experience, and common sense to evaluate their approach and response to unfolding events. They are also trained that they are privileged to use deadly force to prevent great bodily harm to themselves or third parties only when it would be reasonable under all existing circumstances.

Finkley and Stahl offer different but consistent rationales for shooting Smith. Finkley said he thought they were dealing with an armed subject who had threatened citizens with a gun and was refusing to comply with officers' commands. He testified he believed his life and the lives of others were in imminent danger, so he fired his weapon. Stahl said Smith had not obeyed any commands, and that because of shadows he could not see Smith's hands. Stahl said Smith was facing Finkley. Then Stahl heard a shot, saw Smith move toward Finkley, and thought Smith had shot at Finkley. Stahl claimed he then fired one shot to protect Finkley. Finkley said he heard another shot, and then he fired a second shot because he did not believe that Smith had "ceased his threatening actions." The distance between the officers and Smith when they shot can be estimated from the videos as perhaps 15 feet.

Smith disputes both officers' accounts. He denies he made any "threatening actions" and testified he was only trying to follow their instructions to "get on the ground." Smith also

disputes that Stahl could think Smith shot at Finkley. This is because on the stairs Stahl was told Smith did not have a gun in his hand, and Stahl admitted he never saw a gun in Smith's hands.

## II.

Smith filed suit. After twice amending his complaint and abandoning allegations against other defendants, he focused his 42 U.S.C. § 1983 claim as one of excessive force by Finkley and Stahl in violation of the Fourth Amendment. The parties engaged in discovery, including taking depositions of the plaintiff and the officers involved.

Finkley and Stahl then moved for summary judgment, contending that their use of deadly force was reasonable, and if it was not, that they are entitled to qualified immunity. On the use of force, the district court recited the standard that an officer's actions must be assessed from the perspective of a reasonable officer on the scene. Relying on the body camera videos, the district court made a series of findings, including that when Finkley and Stahl approached Smith on the roof, Smith raised his hands and showed that his palms were empty. The court also found that when Smith bent forward, he was surrendering, not lunging or making other threatening movements. According to the district court, Smith was trying to comply with officers' orders by intending to lie face first on the ground.[3]

---

[3] The district court did not name which officer's body camera video it relied on when it made various findings, with one exception. The court referred to Stahl's camera when contrasting his belief that he thought Smith had a gun with Stahl's "camera show[ing] Smith standing with two empty hands immediately before the officers began shooting."

Viewing the evidence in the light most favorable to Smith, the district court concluded that "a reasonable jury could find that [the officers] lacked probable cause to believe that, at the time they used deadly force, Smith posed an immediate threat to their safety or to the safety of others." So the district court denied the officers' summary judgment motion on the issue of the reasonableness of their use of deadly force.

Next, the district court considered each officer's qualified immunity affirmative defense. Incorporating its findings on the officers' use of deadly force, the district court ruled against the officers:

> [W]hen the evidence is viewed in the light most favorable to Smith, it does not show that Officer Finkley perceived that Smith was reaching for a gun at the time he was shot. Nor does it show that Stahl reasonably believed that Smith had a gun and had shot at Finkley. Rather, a jury could reasonably find that both Finkley and Stahl shot an unarmed man who was in the process of surrendering. … Because a jury could find that the officers did not have probable cause to believe that Smith had put them or others in imminent danger, the officers are not entitled to qualified immunity.

On the first part of the officers' dispositive motion, the district court held that a reasonable jury could find that the officers unreasonably used deadly force. For the second part, the qualified immunity decision, the district court phrased the test as what "a jury could find," rather than making a judicial determination. But qualified immunity "is a matter of law for the court." *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004).

No. 20-1754                                                          13

"The question of a defendant's qualified immunity is a question of law for the court, not a jury question." *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir. 1992); *see also Rakovich v. Wade*, 850 F.2d 1180, 1201–02 (7th Cir. 1988) (en banc) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985), and *Harlow v. Fitzgerald*, 457 U.S. 800, 817–19 (1982)) (same).

The officers then filed this interlocutory appeal under 28 U.S.C. § 1291 solely from the district court's denial of qualified immunity, which we review de novo. *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996); *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020).

### III.

### A.

Jurisdiction is this court's first question. *See, e.g., Guerra Rocha v. Barr*, 951 F.3d 848, 851 (7th Cir. 2020). Appellate jurisdiction is generally limited to final decisions under 28 U.S.C. § 1291, but it does extend to collateral orders such as the denial of summary judgment on a defense of qualified immunity. *Mitchell*, 472 U.S. at 528–30. Such an appeal is permitted because "[q]ualified immunity is an entitlement to avoid trial (in addition to other burdens of litigation), and that represents an interest entirely independent of the underlying subject matter of the suit," as well as an interest that is unreviewable on appeal from a final judgment. *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011).

Not all denials of qualified immunity may be appealed, though. "[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."

*Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). But "*Johnson* does *not* prohibit [review of] the abstract legal question of whether a given set of undisputed facts demonstrates a violation of clearly established law." *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013). Because our jurisdiction is confined to questions of law, "we may not review a determination that the evidence is sufficient to proceed to trial." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018). Said differently, our jurisdiction on interlocutory appeal extends to pure questions of law, not mixed questions of law and fact.

The line between a non-appealable factual dispute and an appealable abstract legal question is not always clear, and it has been drawn using different terms and phrases. *Compare Stinson v. Gauger*, 868 F.3d 516, 524 (7th Cir. 2015) (en banc majority) ("Our basic question in determining whether we have jurisdiction over this appeal, then, is whether our case is one of evidentiary sufficiency or one of a question of law."), *with id.* at 532 (en banc dissent) ("The jurisdictional bar applies if the issues raised on appeal are limited to the 'who, what, where, when, and how' of the case."). Either way, a challenger to a district court's denial of qualified immunity "effectively pleads himself out of court by interposing disputed factual issues in his argument." *Gutierrez*, 722 F.3d at 1010. "Of course, any reference to a disputed fact, however cursory, is not automatically disqualifying." *Estate of Williams v. Cline*, 902 F.3d 643, 649 (7th Cir. 2018) (citing *Gutierrez*, 722 F.3d at 1011). Mentioning disputed facts in an otherwise purely legal argument is not fatal, to be sure. Jurisdiction depends on whether the legal and factual arguments are separable. *Id.*

Another approach has been to treat qualified immunity "as an 'abstract' matter of law, for purposes of jurisdiction,

when antecedent facts are taken as given and we are asked to review only the application of a legal standard to those given facts in a qualified-immunity assessment." *Hanson v. Levan*, 967 F.3d 584, 591 (7th Cir. 2020) (ruling on motion to dismiss § 1983 claim that employment termination violated First Amendment as impermissibly based on political affiliation). This contrasts with the case on the merits, which "concerns who is in the right, not how much legal uncertainty must be cleared away to find the answer." *Allman v. Smith*, 790 F.3d 762, 764 (7th Cir. 2015).

Regardless of approach, "[t]he problem" in deciding whether a qualified immunity denial is appealable "is that a great number of orders denying qualified immunity at the pretrial stage are linked closely to the merits of the plaintiff's claim." *Jones*, 630 F.3d at 679 (citing *Johnson*, 515 U.S. at 311-12, and *Mitchell*, 472 U.S. at 527–29). This case's facts "fall[] close to the hazy line between appealable and nonappealable orders established by *Johnson*." *Gutierrez*, 722 F.3d at 1011. When deciding on which side of this line a qualified immunity appeal properly belongs, we closely examine two things. We first review the district court's decision to see if it identifies factual disputes as the reason for denying qualified immunity. And we consider the arguments (or stipulations) offered by those appealing to see if they adopt the plaintiff's facts, or instead make a "back-door effort" to use disputed facts. *See, e.g., Strand v. Minchuk*, 910 F.3d 909, 913–14 (7th Cir. 2018); *Gutierrez*, 722 F.3d at 1010–1011; *Jones*, 630 F.3d at 680–81.

At its root, this boundary is based on the connection, if any, between the qualified immunity defense and the disputed factual questions. Jurisdiction is not proper when "all of the arguments made by the party seeking to invoke our

jurisdiction are dependent upon, and inseparable from, disputed facts." *White v. Gerardot*, 509 F.3d 829, 835 (7th Cir. 2007); *see also Gutierrez*, 722 F.3d at 1009, 1011 (applying this standard).

## B.

We review whether this court has jurisdiction in light of Smith's claim of unreasonable use of deadly force, and of the officers' affirmative defense of qualified immunity, both governed by well-established law.

The use of force against a suspect is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021). Under *Garner*, an officer who uses deadly force on a fleeing suspect violates the Fourth Amendment. An officer acts reasonably when deploying force if he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. When determining the reasonableness of the force used, we consider the factors considered in *Graham v. Connor*, 490 U.S. 386 (1989). The *Graham* factors include the severity of the crime at issue, the immediate threat the suspect posed to the safety of the police officers and others, and if the suspect actively resisted or attempted to evade arrest by flight. *Id.* at 396. In addition, we consider "whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). The fundamental question is "whether the totality of the circumstances justified a particular sort of … seizure." *Garner*, 471 U.S. at 8–9.

No. 20-1754                                    17

Courts assess the totality of the circumstances from the perspective of a reasonable officer on the scene. *See Graham*, 490 U.S. at 396; *see also Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014). "This perspective is critical." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020). "[A] court must consider the amount and quality of the information known to the officer at the time." *Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018) (internal quotation marks omitted). This includes "the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Siler*, 957 F.3d at 759 (quoting *Horton*, 883 F.3d at 950, and citing *Graham*, 490 U.S. at 396–97). "If the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown." *King*, 954 F.3d at 985.

Responding to Smith's claim, the officers argue that their use of deadly force was reasonable, and if not, that they are entitled to qualified immunity. The doctrine of qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806. More than a "mere defense to liability," it provides "*immunity from suit*." *Mitchell*, 472 U.S. at 526. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). The doctrine "is an affirmative defense." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). "[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2015) (per curiam). These questions may be addressed in either order. *Jones*, 630 F.3d at 682 (citing *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009)). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

## IV.

With these legal standards in mind, we now consider our jurisdiction by reviewing the district court's decision and the defendants' arguments on appeal.

At the outset, we note that both the decision and the appellate briefing contain ostensible factual disputes. Two of those—whether Smith complied with orders before Finkley and Stahl arrived, and how Smith approached Finkley—are resolved by the body camera videos, which blatantly contradict Smith's positions. *See, e.g., Johnson*, 944 F.3d at 969; *Dockery*, 911 F.3d at 464–66; *Horton*, 883 F.3d at 944.

First, Smith said he complied with the officers' commands. The videos clearly and repeatedly demonstrate otherwise. Smith refused to stop and talk with Ferrell and Wenzel at 29th and Wells Streets, and then ran away and hid on the roof of the parking garage. Then, for approximately 90 seconds, Smith refused to obey 25 to 30 commands from the officers. Following any brief compliance, such as Smith taking his

hands away from his pockets, were refusals to comply, as by walking away from the officers and crouching behind the eastern AC unit. Put simply, this was a standoff between Smith and the officers, as the videos unequivocally depict. Second, Smith disputed that he moved toward Finkley when the officers got on the roof and approached him. But again, the videos clearly contradict this. They show that while Finkley and Stahl moved east on the roof, Smith stepped toward Finkley with the eastern AC unit between them.

With those facts clarified, we turn to the district court's opinion. On qualified immunity, the court phrased the standard as what a reasonable jury could find, rather than rendering a legal determination. Presuming that the district court meant that a genuine issue of material fact precluded summary judgment for defendants on the grounds of qualified immunity, we conclude that two closely related factual disputes formed the basis for the denial of qualified immunity: (1) how Smith moved to the ground before and as he was shot; and (2) whether Smith posed an immediate threat.[4]

We also examine the appellate arguments to see if they adopt the plaintiff's facts, or if they dispute the sufficiency of the evidence. *Stinson*, 868 F.3d at 524. The defendants say they do not contest the facts on appeal. As for procedure, they argue that the district court erroneously disregarded undisputed facts and substituted its own interpretation of the body

---

[4] The parties also disagree as to why Stahl shot Smith, but as framed by the parties, this dispute does not impact the question of appellate jurisdiction. At issue is whether a reasonable officer under these circumstances would have used deadly force, *Graham*, 490 U.S. at 396, not Stahl's subjective state of mind as to why he shot. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

camera videos. As for substance, the defendants present arguments on each prong of qualified immunity, first that neither officer's actions here amounted to a constitutional violation, and second that the constitutional right allegedly violated was not clearly established.

The standard, again, to determine if appellate jurisdiction exists is whether the defendants' arguments for qualified immunity depend upon, and are inseparable from, these two factual disputes concerning Smith's movement and the level of threat he posed. *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019); *Gutierrez*, 722 F.3d at 1011; *White*, 509 F.3d at 835. We evaluate our jurisdiction for each of the two prongs of qualified immunity. *See, e.g., Strand*, 910 F.3d at 915–16; *Weinmann v. McClone*, 787 F.3d 444, 447–51 (7th Cir. 2015).

### A.

On the first prong, as to the violation of a constitutional right, the question is whether the totality of the circumstances justified the use of deadly force. *See Garner*, 471 U.S. at 8–9. We assess this question from the standpoint of a reasonable officer on the scene under the *Graham* factors. 490 U.S. at 396; *see also Burton*, 901 F.3d at 780; *Dawson*, 803 F.3d at 833. To appreciate that viewpoint, we consider what a reasonable officer in this case's circumstances knew and perceived.

*Suspicion of committing a crime.* Smith was suspected of returning to the scene of a fight with a gun. Finkley and Stahl knew this from the first dispatch.

*Threat presented, including whether suspect was armed.* Finkley and Stahl reasonably believed that Smith was armed with a gun. They knew Ferrell and Wenzel reasonably believed that Smith was carrying a gun. The second dispatch,

which Finkley and Stahl heard, also stated that the suspect was armed. As they mounted the stairs, Finkley asked Ferrell if Smith "got the gun in his hand" and Ferrell responded "he doesn't have a gun in his hand but he was hiding behind the AC unit."

*Actively resisting.* Smith's fleeing, hiding from the officers, and not complying with their repeated commands all demonstrated active resistance. These facts were part of a dispatch that Finkley and Stahl heard, and when they arrived behind the apartment building, they saw the standoff (as the videos depict). In addition, as they went up the stairs to the roof, Ferrell told them that Smith had been hiding.

*Duration and stress of episode.* This short-duration, high-stress episode necessitated quick decisions in dangerous and uncertain circumstances. Stahl's video shows that he and Finkley parked their car in the alley behind the apartment building about 45 seconds before the shooting. Shortly after, Stahl saw Smith on the roof and drew his service weapon. Finkley and Stahl reached the stairs to the roof about 20 seconds before the shooting, and about 10 seconds passed between the defendants getting on the roof and the shooting. Each of the body camera videos depict a high-pressure situation.

Considering this case under the *Graham* factors, many of these circumstances would justify the use of deadly force from the perspective of a reasonable officer stepping onto the roof where Smith stood. An individual suspected of a crime involving a firearm, whom the defendant officers reasonably believed was armed with a gun, had fled and hid from the police. When discovered, the suspect failed to obey numerous commands from different officers and a standoff lasting about

two minutes occurred in a public location bounded by occu-
pied buildings in the middle of the day. This was active re-
sistance.

At the same time, the totality of the circumstances to jus-
tify a seizure includes the period just before and during the
shooting. *See Estate of Williams v. Ind. State Police Dep't*, 797
F.3d 468, 483 (7th Cir. 2015) (considering short time period
from officer's arrival until seizure as relevant to determina-
tion of whether lethal response was objectively reasonable).
Critical to a reasonable officer's perspective here is what oc-
curred as the officers were moving onto and across the roof
toward Smith before shooting. This included two closely re-
lated factual disputes: (1) how Smith moved to the ground be-
fore and as he was shot; and (2) whether Smith presented an
immediate threat to the defendant officers. These factual dis-
putes impact two of the *Graham* factors—the threat level
(including whether the suspect is armed) and the suspect's re-
sistance, or lack thereof.

*1. Smith's movement downward*

The parties strongly contest whether on the roof Smith
"lunges" (the officers' characterization) or "leans down"
(Smith's description). The videos from the body cameras of
Finkley and Stahl each depict this sequence.

Finkley and Stahl aver that as they approached Smith, he
"lunged" down behind the far AC unit where he could have
picked up a gun he might have previously placed there. Fer-
rell and Wenzel saw Smith crouch down on the other side of
that unit, which Wenzel's video also captures. On the stairs to
the roof, Ferrell told Finkley and Stahl that Smith was "hiding
behind the AC unit," but Ferrell did not describe which unit.

Smith testified that instead of lunging down, he showed the officers his empty hands, told them he did not have a gun, and then turned to lay on his stomach to be handcuffed. Smith says he "leaned" toward the ground trying to follow instructions to get down. Wenzel's body camera audio captured a command to "get over here and get on the ground" 25 seconds before the shooting.

How Smith's movement is perceived likewise can differ based on the point of view from each officer's body camera. In Finkley's video, Smith appears to step toward Finkley, with the AC unit between them, and then Smith moves down behind the unit to an area not visible to Finkley. In Stahl's video, Smith appears to incline down at a deliberate pace, several feet back from the AC unit, and at an angle toward the roof rather than the base of the unit.

From the objective perspective of a reasonable officer on the scene, a factual dispute exists as to what Smith appeared to be doing directly before and as shots were fired. The officers' videos do not blatantly contradict or corroborate the version of events for one side or the other, leaving this factual dispute unresolved. *See Hurt v. Wise*, 880 F.3d 831, 840 (7th Cir. 2018) (concluding that video of interrogations did not portray uncontestable facts such as in *Scott*). Yet this sequence is an essential part of the totality of the circumstances in evaluating whether the seizure by shooting was a constitutional violation. Finkley and Stahl point to Smith's movements as they approached him on the roof as the reason they shot, but it is an open factual dispute whether Smith appeared to be surrendering or continuing to actively resist. Each interpretation goes to the qualified immunity question, the former weakening the defense and the latter strengthening it.

### 2. *Smith as an immediate threat to safety*

The parties also heavily dispute whether Smith posed an immediate threat to safety while they were on the roof. This dispute is closely linked with the first factual dispute over Smith's movement before he is shot.

As the officers moved across the roof and approached Smith in its northeast corner, the Finkley and Stahl videos show that Smith moved toward the apartment building wall, and then turned and stepped toward Finkley with the AC unit between them. They also show that Smith was moving deliberately but not aggressively and that he was not complying with Stahl's verbal commands to raise his hands and to turn around. Smith denies he was an immediate threat and says that following the earlier command to "get down" he leaned toward the ground to be restrained. The officers argue Smith was an immediate threat because he was suspected of a gun crime, he was armed (or so they reasonably believed), and he was actively resisting.[5]

Again, a factual dispute exists as to whether, from the perspective of a reasonable officer on the scene, Smith appeared to pose an immediate threat to their safety or the safety of

---

[5] The videos are not clear as to whether, when Finkley and Stahl approached Smith, he held a dark object (a black flip-phone) and what role, if any, it may have played in the threat calculus. The officers averred they saw Smith on the roof holding a cell phone. When Finkley and Stahl moved onto the roof and toward Smith, the videos show Smith facing the officers with his arms waist high and his empty palms facing out. As Stahl approached Smith, Stahl said that given the dark background he could not see whether Smith had anything in his hands. Stahl's video shows that as Smith is shot, a black flip-phone immediately falls away from Smith's body and onto the ground beneath him.

others. Finkley and Stahl point to the threat Smith posed as one of the reasons they shot, and Smith denies he engaged in any "threatening actions."[6] The videos again do not resolve this dispute. If the video is viewed as Smith surrendering, no reasonable officer would shoot in those circumstances. If viewed as not surrendering, or surrendering from Stahl's perspective but not Finkley's, then the use of force may have been justified. And each interpretation goes to the qualified immunity question, the first weakening the defense and the second strengthening it.

*    *    *

On this record, we have no difficulty concluding that from the viewpoint of a reasonable officer on the scene, Smith posed a threat to officers before and as the officers moved onto the roof. Finkley and Stahl reasonably believed Smith was armed and that he was actively resisting, two of the factors in determining the objective reasonableness of the use of deadly force and thus whether a constitutional right was violated. *See Graham*, 490 U.S. at 396; *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). Yet the foremost consideration in this evaluation is what happened on the roof. Those ten seconds—especially the last four seconds preceding and during the shooting—are the subject of vigorous factual disputes.

Finkley and Stahl argue their actions were consistent with constitutional standards. To a reasonable officer in these

---

[6] Smith's statement to Finkley and Stahl—"What are you going to do, shoot me?"—which was not recorded, could be viewed as suggesting Smith was antagonistic, or that he was resigned to his fate. Because the statement neither increases nor decreases the threat level or level of resistance, we do not find it material to the jurisdictional analysis.

circumstances, given what was known and perceived, Smith presented a continuing immediate threat and actively resisted, or so they contend. But the record must be viewed in a light most favorable to Smith. The videos reveal that, in the four seconds before the shooting, Smith shows his hands empty with palms out at waist height, steps toward Finkley, and after an order 25 seconds earlier to "get on the ground," moves down to the ground. Crucially, the immediacy of the threat that Smith presented, and his level of resistance, could have sufficiently diminished from when the officers first stepped onto the roof. From a reasonable officer's perspective, and based on the totality of the circumstances, deadly force may no longer have been warranted when the officers shot Smith.

These circumstances have analogues in this court's case law. An individual surrendering to officers, or getting down to the ground so handcuffs could be put on, is a reduced threat and is putting up less resistance. *See Gant*, 924 F.3d at 451; *Strand*, 910 F.3d at 915; *White*, 509 F.3d at 836–37. To a reasonable officer in these circumstances, whether Smith continued to present a threat, how immediate that threat was, and whether Smith continued to resist and how much, are uncertainties and unresolved material questions of fact. *See Strand*, 910 F.3d at 917; *Weinmann*, 787 F.3d at 449–50. To resolve these disputes, we would need to consider inferences from facts which the parties dispute: the pace and manner in which Smith approached Finkley; whether Smith's movements presented an immediate or diminished threat; and whether and how much Smith was resisting during the officers' final approach. Considering inferences is something "we cannot do without going beyond our jurisdiction on this interlocutory appeal." *Hurt*, 880 F.3d at 839.

No. 20-1754                                                        27

Whether the evidence was enough to constitute a threat or active resistance marks these as disputes about the sufficiency of the evidence. An appeal of the sufficiency of the evidence for the denial of qualified immunity is not eligible for interlocutory consideration. *See Plumhoff*, 572 U.S. at 772 (citing *Johnson*, 515 U.S. at 313); *Stinson*, 868 F.3d at 526; *Jones*, 630 F.3d at 680. If we were to resolve these factual disputes, we would be evaluating the quantity and quality of proof, not ruling on an abstract legal question.

In these ways this case is like *McKinney v. Duplain*, 463 F.3d 679 (7th Cir. 2006), in which the district court denied qualified immunity on a § 1983 excessive force claim based on a factual dispute. There, the officer testified he shot as a suspect charged toward him, which the plaintiffs' forensic evidence contradicted. *Id.* at 689. This court evaluated the case on the first qualified immunity prong and decided that there was a factual dispute as to whether a reasonable officer could conclude that the circumstances posed a threat of serious physical harm to himself or others. No jurisdiction existed because this type of factual dispute was not reviewable on interlocutory appeal. *Id.* at 690–91. This court also noted the close connection between the factual dispute on jurisdiction and the merits of the case, and therefore how *Johnson* precluded interlocutory review. *Id.* at 691.

Before the officers' legal argument for qualified immunity can be decided, these factual disputes as to how much of a threat Smith posed and how actively he was resisting must be resolved. The disputes cannot be separated from whether a constitutional right was violated. *See Gutierrez*, 722 F.3d at 1011; *White*, 509 F.3d at 835. These questions are not "different from any purely factual issues that the trial court might

confront if the case were tried." *Plumhoff*, 572 U.S. at 773. Rather, they are at the center of this case, which affects appellate jurisdiction at this interlocutory stage.

**B.**

To repeat, our evaluation of appellate jurisdiction requires us to decide if the defendants' arguments for qualified immunity depend upon, and are inseparable from, the factual disputes concerning Smith's movement and the level of threat he posed. On the second prong of qualified immunity, the question is whether the constitutional right at issue was clearly established at the time of the alleged violation. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Weinmann*, 787 F.3d at 450 (internal quotation marks omitted). "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). This means "[w]e analyze whether precedent squarely governs the facts at issue, mindful that we cannot define clearly established law at too high a level of generality." *Strand*, 910 F.3d at 917. The Supreme Court has explained that it is particularly important to adhere to this requirement in excessive force cases, as it can be difficult to determine how the law on excessive force will apply to a factual situation. "[T]he result depends very much on the facts of each case," *Emmons*, 139 S. Ct. at 503, and "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"

No. 20-1754                                                    29

*Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff*, 572 U.S. at 778–79).

Finkley and Stahl argue they are entitled to qualified immunity because the constitutional right Smith claims was not clearly established in a particularized sense, and they were not on notice that their actions violated the Constitution. We consider whether precedent clearly establishes that deadly force in these circumstances is inappropriate in response to conduct like Smith's.

This court's cases provide that on the date of these events, August 31, 2017, shooting an unarmed and surrendering suspect who was not actively resisting in the moments before shooting and who posed a diminishing threat would violate clearly established law. Deadly force is warranted only when an immediate threat of serious harm to the officers is present. *Weinmann*, 787 F.3d at 448; *Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Finkley and Stahl in their affidavits in the district court averred that they were trained on that principle.

"Our decisions show that it is unreasonable to use deadly force against a suspect who is not resisting arrest and who is genuinely attempting to surrender." *Gant*, 924 F.3d at 451; *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("This prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon."); *Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016) (noting it is "clearly established that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force"). We

also recognized this principle in *Strand*. 910 F.3d at 918 (citing *inter alia Miller*, 761 F.3d at 829); [7] *see also Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016) (upholding denial of qualified immunity where an officer used force on suspect who was not fleeing, out in the open, and surrendered with hands above his head); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (concluding that an officer's justification to shoot is not retained to fire at any time thereafter with impunity). As articulated in these cases, the contours of Smith's constitutional right were sufficiently defined that officers would have understood what actions violate that right.

We return to the district court's analysis. Although the law on this right is clearly established, and not too general to govern these facts, on the metrics of "imminent danger" and "immediate threat of serious harm" the record viewed in the light most favorable to Smith shows factual disputes. At this point, those disputes are plain: whether, before and as Finkley and Stahl used deadly force, Smith was threatening or resisting the officers. These questions are unresolved and material to the "clearly established law" prong. Appellate jurisdiction therefore is not proper.

Caselaw confirms this conclusion. In excessive force cases under § 1983 involving a diminished threat of harm and waning danger from a possible surrender, this and other courts have concluded from these sorts of factual disputes that appellate jurisdiction is absent. In *White*, the district court denied qualified immunity and found a genuine issue of material fact as to whether an individual who did not have a gun in his

---

[7] While *Gant* and *Strand* post-date these events on August 31, 2017, the authorities they rely on pre-date those events.

No. 20-1754                                             31

hands, upon hearing an officer's command to "freeze," turned with his hands in the air to face the officer and was shot. 509 F.3d at 832 (7th Cir. 2007). This court concluded that it lacked jurisdiction to review this denial because the arguments that the officer presented—like here, concerning where and how the plaintiff placed his hands—wholly depended upon, and were inseparable from, the officer's reliance on disputed facts about whether the plaintiff presented a threat. *Id.* at 835.

More recently, we decided an appeal in which a district court had denied qualified immunity to a police officer who, after an argument and fist fight, shot the plaintiff. *Strand*, 910 F.3d at 913. Given an unexplained gap between when the fight stopped and when the officer shot, a genuine issue of material fact existed concerning whether the plaintiff was placing the officer in imminent danger or actively resisting. *Id.* at 917. We concluded that the "existence of a substantial factual dispute about the circumstances and timing surrounding [the officer's] decision to shoot [the plaintiff] precludes a ruling on [both prongs of] qualified immunity at this point." *Id*. at 918.

We reached the same result in *Gant*. 924 F.3d at 447. In that case, video recordings showed the following in quick succession: officers approached the crime scene (a store); a suspect ran out of the store and disregarded officers' command to get on the ground; and one officer began to run toward the suspect but turned to see plaintiff standing at the entrance of the store. *Id.* The officer shot the plaintiff, mistakenly believing he was holding a handgun. The plaintiff argued he was attempting to surrender. *Id.* Viewing the evidence in the light most favorable to the plaintiff, the district court denied the officer's request for qualified immunity. *Id.* at 448. We watched the videos and determined that they did not "utterly discredit"

the plaintiff's position that he was trying to comply with or-
ders. *Id.* at 450.

At issue in *Gant* was the same constitutional right as
here—it is unreasonable to use deadly force against a suspect
who is not resisting arrest and who is genuinely attempting
to surrender. We held that the officer could not pursue an in-
terlocutory appeal by arguing that the evidence is insufficient
to support the district court's conclusion. *Id.* at 451. *See also
McKinney*, 463 F.3d at 690–91. *But see Johnson*, 576 F.3d at 660
(finding appellate jurisdiction on excessive force claim, and
affirming grant of summary judgment that the force used—a
police dog—was objectively reasonable because plaintiff sur-
rendered at last second after he had used every possible
method at his disposal to flee from police).

Other circuits have reached comparable conclusions. In
*Henderson v. City of Woodbury*, 909 F.3d 933 (8th Cir. 2018), a
§ 1983 Fourth Amendment excessive force decision, genuine
issues of material fact existed as to whether an individual,
after he had escaped from a hostage situation, had fully com-
plied with officers' commands to show his hands and to re-
main still while he was laying on the ground before he was
shot and killed. *Id.* at 939–40. There the Eighth Circuit re-
versed a finding of qualified immunity for the defendants and
remanded for further proceedings. *Id.* at 940.

The same circuit concluded that whether officers had seen
a gun in a suspect's hand and whether the officers had reason
to fear for their physical safety when they shot were material
factual disputes in *Nance v. Sammis*, 586 F.3d 604, 608–09 (8th
Cir. 2009). Similar to here, the officers ordered the plaintiff to
get on the ground, and the plaintiff raised his hand or hands
while trying to get to the ground before the officer shot him

twice. *Id.* at 607. Viewing the record in the light most favorable to the plaintiff, the Eighth Circuit agreed with the district court that disputed factual circumstances prevented a grant of summary judgment for qualified immunity. *Id.* at 611–13.

The Ninth Circuit considered a case similar to this one in *Estate of Anderson v. Marsh*, 985 F.3d 726 (9th Cir. 2021). A high-speed car chase ended with the driver crashing. *Id.* at 728. The pursuing officer approached the vehicle, and according to the officer, the driver reached down towards the passenger seat. *Id.* at 729. This caused the officer to fear that the driver was reaching for a weapon. *Id.* The officer shot the driver, paralyzing him from the chest down. *Id.* A surveillance video captured the crash and the officer's approach, but not the car's interior. *Id.* The district court denied the officer's request for qualified immunity, concluding that viewing the evidence in a light most favorable to the plaintiff, the driver was unarmed with his hands visible. *Id.* at 730.

In *Marsh*, like here, the officer's interlocutory appeal challenged the factual basis for the district court's immunity denial. The officer contested the district court's decision that there was a genuine factual dispute as to whether the driver was reaching under the seat when the officer shot him. *Id*. at 733–34. But because the appeal impermissibly challenged the sufficiency of the evidence, the Ninth Circuit dismissed for lack of jurisdiction. *Id.* at 734. Two other circuits have reached similar conclusions. *See Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019) (concluding that a factual dispute existed as to whether a suspect who was shot constituted threat, which precluded appellate jurisdiction over qualified immunity decision); *Witt v. West Va. State Police, Troop 2*, 633 F.3d 272, 276-77 (4th Cir. 2011) (ruling that video of an altercation

between plaintiff and officers was inconclusive, and agreeing with the district court that factual disputes as to whether plaintiff posed threat and resisted were questions of material fact precluding grant of summary judgment on qualified immunity).

These analogous decisions show that factual disputes about a diminishing threat or reduced resistance can preclude appellate jurisdiction or a grant of qualified immunity. Just so, on facts close but not identical to those here, courts have concluded that appellate jurisdiction exists. Those decisions are distinguishable, though, in two critical ways: they involved a more combative suspect, or the suspect was holding or touching a weapon.

For example, the Eighth Circuit affirmed a grant of qualified immunity for an officer who shot a combative suspect. *Loch v. Litchfield*, 689 F.3d 961 (8th Cir. 2012). The case involved a drunken suspect, who ignored officer's orders to get on the ground and continued to engage in aggressive behavior, including approaching the officer, until he shot the suspect. *Id.* at 964. There, the suspect was far more aggressive than Smith, going to the threat the suspect posed and his continued active resistance. *Id*. at 965–68.

Whether the suspect is holding or touching a weapon when shot is also of great consequence in these cases. In one case decided by our court, after a vehicle pursuit a suspect fled on foot resulting in a standoff with police. *Siler*, 957 F.3d at 754–57. An officer saw a black cylindrical object pressed against the suspect's forearm. *Id.* at 757. The officer pointed his gun at the suspect and ordered him to "drop it" and "get to the ground." *Id.* The suspect refused, and the officer shot him. *Id*. On those facts this court affirmed a grant of qualified

immunity. *Id.* at 760. The same fact played a key role in *Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020), in which officers were investigating a report of a stolen firearm. They arrived at the front of a building, and a suspect ran through a breezeway carrying a gun. *Id.* at 800. After the officer shot the suspect, the Eighth Circuit concluded he had used reasonable force. *Id.* at 801.

Contrast this case to *Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049 (10th Cir. 2020). There, officers pulled up to arrest Valverde in an undercover drug transaction. *Id.* at 1055. As Valverde exited his vehicle, he took a gun from his pocket or waistband area. *Id.* at 1057. An officer saw the gun barrel and Valverde's hand on the gun. *Id.* at 1062. The officer then fired and shot Valverde dead. *Id.* at 1054–57. The district court denied qualified immunity, and aerial video captured the events. *Id.* at 1056. The Tenth Circuit concluded that it had interlocutory appellate jurisdiction in the case, as the shooting officer did not dispute that Valverde was discarding the gun and raising his hands before he was shot. *Id.* at 1059. The appeals court reversed and granted the officer qualified immunity, concluding that the officer had only a split second to react when Valverde suddenly drew a gun. *Id.* at 1059–60, 1068. The threat in *Valverde* was greater than here. Although Finkley and Stahl reasonably believed Smith was armed, no officer on the stairway or on the roof saw Smith touch a firearm. Indeed, no gun was ever found there.

Our recent decision in *Lopez v. Sheriff of Cook County*, 993 F.3d 981 (7th Cir. 2021), is also distinguishable. That case involved an off-duty police officer, who responded to gunfire, shot a suspect holding a gun, and then used the suspect's body as a human shield to ward off the suspect's armed

companion. *Id.* at 983–85. In *Lopez*, the district court had granted the officer qualified immunity, which this court affirmed after reviewing security video of the events and concluding that no precedent clearly established that the officer's split-second decision to open fire was unlawful. *Id.* at 987–90.

The facts in *Lopez* differ materially from this case. The suspect there not only had a gun, like in *Valverde*, but also had already fired it twice and was walking in the general direction of the officer with a gun in his hand. *Id.* at 989. The officer arrived on the scene because shots had been fired, so the danger was actual, not potential. The standoff in front of the club in *Lopez* had already turned violent, materially altering the totality of the circumstances. So the suspect in *Lopez* presented a greater threat and offered greater resistance than Smith did here. The video in *Lopez* clarified the totality of the circumstances, while the video here reveals hotly contested factual disputes.[8]

### C.

This case raises close questions, and if the facts varied slightly, the outcome could be different.

---

[8] If no analogous case established a right to be free from the force Finkley and Stahl used, Smith could have tried to show "that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Weinmann*, 787 F.3d at 450 (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)). *See, e.g., Taylor v. Rjojas*, 141 S. Ct. 52, 53–54 (2020). But given the nature of the open and contested factual disputes here, this "plainly excessive force" path is not open to Smith. This is not one of those "rare cases" in which the constitutional violation is "patently obvious" and "so outrageous." *Leiser v. Kloth*, 933 F.3d 696, 704 (7th Cir. 2019) (internal quotation marks omitted); *see also Weinmann*, 787 F.3d at 451.

No. 20-1754                                                          37

It can be argued that the inquiry here is purely legal and may be answered on this record. That argument goes as follows: Under its second prong, qualified immunity is not pierced unless it is sufficiently clear to a reasonable officer that in these circumstances it was not lawful to use deadly force. *Weinmann*, 787 F.3d at 450. This key inquiry is a legal question. *See Mullenix*, 136 S. Ct. at 308 (noting that "objective unreasonableness is a question of law"); *Siler*, 957 F.3d at 759 (viewing totality of circumstances and drawing all inferences for nonmovant, if material facts undisputed, then reasonableness is pure question of law); *Dockery*, 911 F.3d at 464 ("Whether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." (internal quotation marks omitted)). According to this argument, the qualified immunity decision can be made because the historical facts have not changed since August 31, 2017. If the record reveals some uncertainty as to one or the other party's responsibility—such as in the last four seconds before the shooting—any mistake by the defendant officers as to what is legally allowed is protected by qualified immunity.

For this case, that argument paints with too broad a stroke. Our dissenting colleague suggests that nothing turns on the answers to the disputes about whether Smith was surrendering or how immediate a threat he presented. For the dissent, the videos circumscribe the parameters of "historical fact." So long as there is video evidence, the dissent reasons, the historical facts are preserved and not debatable.

We disagree. Historical facts "address[] questions of who did what, when or where, how or why." *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018). The body

camera recordings here answer the who, what, and where, but they do not fully capture the how and why. *Cf. Stinson v. Gauger*, 868 F.3d at 532 (dissenting opinion) ("*Johnson* blocks an immediate appeal only when the district court's order is limited to pure questions of historical fact—in other words, when the sole dispute is whether and how certain events or action occurred."). Here, the parties vigorously debate the how and why. Not surprisingly so—videos, or portions of them, can be viewed differently. (Consider, for example, the contrasting interpretations of the videos between our dissenting colleague and the district court.) *Cf. Gant*, 924 F.3d at 450-51 (concluding that video recordings did not amount to "irrefutable evidence" of the facts).

That leads us to the dissent's point that *Plumhoff*, rather than *Johnson*, controls here. In *Plumhoff*, the Court elucidated a distinction between appealable legal issues and purely factual issues. 572 U.S. at 773. *Johnson* involved the question whether the pretrial record "was sufficient to show a genuine issue of fact for trial"—a factual issue. *Id.* at 307–08. The question in *Plumhoff*, on the other hand, was whether the officers' conduct violated the Fourth Amendment—a legal issue. *Id.*

We do not disagree with this distinction. The majority here parts ways with the dissent as to how the issue in this case is characterized: what the dissent sees as a legal issue, the majority views as a factual dispute precluding appellate jurisdiction. To the majority, the body camera videos leave critical aspects of historical facts unresolved. Other cases from this court have observed that disputes over historical facts can preclude interlocutory appellate jurisdiction. *See, e.g., Strand*, 910 F.3d at 918 (recognizing "substantial factual dispute about the circumstances and timing surrounding" an officer's

decision to shoot "precludes a ruling on qualified immunity at this point"); *Weinmann*, 787 F.3d at 451 (ruling that "[t]he existence of a factual dispute about the circumstances surrounding [an officer]'s decision to fire on [the plaintiff's deceased] precludes a ruling on qualified immunity at this point"); *White*, 509 F.3d at 837 (holding that the court lacked jurisdiction to hear an officer's interlocutory appeal because legal arguments that the officer presented on appeal were wholly dependent upon, and inseparable from, his reliance on disputed facts). The dissent's approach does not make room for these precedents.

Historical facts remain in dispute here. Recall that if Smith showed empty hands and was surrendering, or if he was complying with a previous order to get down on the ground, that would affect factors critical to the officers' decisions to use deadly force. From a reasonable officer's perspective, the immediacy and degree of the threat, and whether the suspect was actively resisting, could have sufficiently diminished so that the totality of the circumstances did not warrant the use of deadly force. Indeed, if Smith displayed empty hands before the shooting and was surrendering, he was complying with commands and thus neutralizing the threat he posed. Admittedly, Smith did not comply with Stahl's orders to turn around and to put up his hands. But Smith's movement to get on the ground could have been at least part of what officers had ordered him to do 25 seconds before shots were fired.

Threats can diminish, and resistance can decrease. If those conditions have curtailed, a reasonable officer may not conclude that in these circumstances it was lawful to use deadly force. *See Strand*, 910 F.3d at 915. "[A]n exercise of force that is reasonable at one moment can become unreasonable in the

next if the justification for the use of force has ceased." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009). *See Lopez*, 993 F.3d at 987 (stating "authoriz[ation] to use deadly force at one moment … is not a blank check"). This court has cautioned that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis*, 999 F.2d at 247. After all, "[t]he circumstances might materially change," for "[e]ven though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment." *Horton*, 883 F.3d at 950.

We acknowledge the split-second decisions that Finkley and Stahl had to make on the parking garage roof. *See Graham*, 490 U.S. at 396–97; *Horton*, 883 F.3d at 950. The events and the speed at which they occurred here certainly implicates the qualified immunity defense, and the burden rests on Smith to disprove this affirmative defense. *Jewett*, 521 F.3d at 823. In the ten seconds the officers were on the roof and approached Smith—especially in the last four seconds as they moved closer to Smith—the officers had to decide whether Smith's movements were threatening and whether he continued to resist, as well as whether the use of deadly force was necessary.

And to be sure, Smith put himself in this situation by not surrendering earlier. A suspect can set dangerous events in motion rendering it impossible to surrender without the risk of lawful force being used against them. *See Johnson*, 576 F.3d at 660. In certain circumstances officers may have no way to ascertain a suspect's intentions without risking their own safety or the safety of others.

But if the officers could conclude that a suspect is surrendering and displaying a decreasing level of threat and resistance, then the use of deadly force may no longer be justified. The events here preceding and during the shooting remain subject to interpretation, including the level of threat Smith posed and how actively he was resisting. These questions are important to and inseparable from the qualified immunity decision.

The perspective of each officer also may differ—from Finkley's perspective, Smith may have presented a continued threat, but that may not be the same for Stahl. These videos are "fairly open to varying interpretations." *Horton*, 883 F.3d at 944. We do not derive certainty from the video depictions of the last four seconds before Smith was shot.

## D.

This case shows how jurisdiction over an interlocutory appeal and the affirmative defense of qualified immunity can be in tension. Qualified immunity permits officers to make mistakes as to what is legally allowed. The challenge is drawing the contours of qualified immunity on interlocutory appeal while resolving only abstract legal questions and not factual disputes. Here, the jurisdictional standard prevails because the factual disputes this record presents collapse into the merits determination. *Mitchell v. Forsyth* does not preclude this conclusion, either. There, the Court stated that qualified immunity is "effectively lost" if a case proceeds to trial, but that does not mean such a defense is conclusively lost. That is because there is a presumption against interlocutory jurisdiction, *see* 28 U.S.C. § 1291, and we are interpreting an exception

to it. *Mitchell*, 472 U.S. at 527–29. And *Mitchell* makes room for an exception such as here.

To reach these questions would not properly reflect what the collateral order doctrine seeks to do. *See McKinney*, 463 F.3d at 691 (citing *Johnson*, 415 U.S. at 316–17). "*Mitchell* described an immunity appeal as 'conceptually distinct from the merits' which the Court saw as an essential condition of interlocutory review." *Allman*, 790 F.3d at 763 (citations omitted). The framework allowing for interlocutory review of a qualified immunity decision "breaks down if there is no separation between the merits of the underlying lawsuit and the subject matter of the collateral order being appealed." *Jones*, 630 F.3d at 679. To avoid this, the qualified immunity order must be separable from the primary suit. *Id*. Given the factual disputes in this record, though, little if anything separates the evaluation of jurisdiction from deciding the merits.

This is not a qualified immunity case in which we review only the application of a legal standard to the antecedent facts. *See Hanson*, 967 F.3d at 591. The officers here have not asked us to clear away legal uncertainty to find the answer. *See Allman*, 790 F.3d at 764. Rather, they effectively ask us to resolve what happened on August 31, 2017, at approximately 1 p.m. on the roof of the parking garage behind 2905 West Wisconsin Avenue in Milwaukee. The officers' arguments raise the critical liability question of "who is in the right." *Id*. Is it the officers because Smith appeared to present a threat and was actively resisting, or Smith because he appeared to be surrendering and complying with a previous order? "An appeal from a ruling on qualified immunity is not the time for the resolution of disputed facts." *Weinmann*, 787 F.3d at 446. Because the record presents material factual disputes

important to and inseparable from the qualified immunity analysis, we dismiss this appeal for lack of jurisdiction.

### E.

This is not the final word on qualified immunity for this case. The district court's decision stated (somewhat imprecisely) that the officers are not entitled to qualified immunity. But that decision was a denial of the officers' summary judgment motion, which sought a ruling both that the use of deadly force was lawful and protected by qualified immunity. As described above, the qualified immunity determination is intertwined with factual disputes concerning threat level and surrender. So although the officers were not entitled to qualified immunity at the summary judgment stage, the district court's decision essentially means that the affirmative defense remains preserved for a later ruling.

The existence of material factual disputes "precludes a ruling on qualified immunity at this point." *See Strand*, 910 F.3d at 918–19; *see also Warlick*, 969 F.2d at 305–06 ("When the issue of qualified immunity remains unresolved at the time of trial, … the district court may properly use special interrogatories to allow the jury to determine disputed issues of fact upon which the court can base its legal determination of qualified immunity." (citing *Rakovich*, 850 F.2d at 1202 n.15)). And the qualified immunity defense, preserved for later determination, remains a legal decision for the district court. *See Estate of Escobedo v. Martin*, 702 F.3d 388, 403–04 (7th Cir. 2012) (affirming the grant of qualified immunity after a jury finding on a factual dispute).

## V.

The defendant police officers here seek to appeal from a district court decision and order which found genuine and material factual disputes that cannot be separated from the officers' arguments seeking qualified immunity. *See Johnson*, 515 U.S. at 320. Therefore, we DISMISS for lack of appellate jurisdiction.

No. 20-1754                                          45

SYKES, *Chief Judge*, dissenting. The majority holds that under *Johnson v. Jones*, 515 U.S. 304 (1995), we lack jurisdiction to hear this qualified-immunity appeal. I respectfully disagree. As I have explained elsewhere, the jurisdictional limitation identified in *Johnson* is a narrow exception to the general rule that a pretrial order denying qualified immunity is an immediately appealable final order under 28 U.S.C. § 1291 and the collateral-order doctrine. *See Stinson v. Gauger*, 868 F.3d 516, 529–34 (7th Cir. 2015) (Sykes, J., dissenting). *Johnson* does not block appellate jurisdiction here.

To see why, it's helpful to begin with the reasoning that underlies the general rule. The Supreme Court held long ago that qualified-immunity appeals fit comfortably within the collateral-order doctrine as established in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). *Mitchell v. Forsyth*, 472 U.S. 511, 527–30 (1985). As the Court explained in *Mitchell*, under the *Cohen* framework, a pretrial ruling is immediately appealable if the claim of right "cannot be effectively vindicated after the trial has occurred." *Id.* at 525. *Mitchell* held that orders denying qualified immunity satisfy this requirement *as a class*. *Id.* at 525–26. Why? Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Id.* at 526. It is "an *immunity from suit* rather than a mere defense to liability[,] and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The collateral-order doctrine has two additional requirements: the pretrial order must "conclusively determine the disputed question," and the question must involve a claim of right that is "separable from, and collateral to, rights asserted in the action." *Id.* at 527 (quotation marks omitted).

No. 20-1754

*Mitchell* held that a pretrial order denying qualified immunity "easily meets these requirements." *Id.* Why? Because "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Id.* at 527–28.

This is so *even though* the court's resolution of the qualified-immunity claim "will entail consideration of the factual allegations that make up the plaintiff's claim for relief." *Id.* at 528. "[T]he same is true," the Court explained, "when a court must consider whether a prosecution is barred by a claim of former jeopardy or whether a Congressman is absolutely immune from suit because the complained of conduct falls within the protections of the Speech and Debate Clause." *Id.*

> In holding these and similar issues of absolute immunity to be appealable under the collateral order doctrine, the Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the *Cohen* test *even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue*.

*Id.* at 528–29 (emphasis added) (citations omitted).

The Court's holding was thus categorical: The question of qualified immunity is *always* conceptually separate from and collateral to the merits of the underlying claim for relief. *Mitchell* announced a general rule that qualified-immunity rulings, no less than absolute-immunity rulings, are immediately appealable.

*Johnson* did not alter this rule. Rather, the Court simply recognized the unexceptional principle that "a defendant [who is] entitled to invoke a qualified immunity defense[] may not appeal a district court's summary judgment order *insofar as* that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. at 319–20 (emphasis added). As I explained in my *Stinson* dissent, the qualifying phrase "insofar as" is important. 868 F.3d at 529 (Sykes, J., dissenting).

*Johnson* involved a Fourth Amendment claim accusing police officers of using excessive force during an arrest. 515 U.S. at 307. The plaintiff alleged that the arresting officers severely beat him, causing serious injuries. He sued five officers but did not identify which ones actually beat him. *Id.* Three of the officers sought summary judgment based on qualified immunity, arguing that the plaintiff lacked evidence that they participated in the beating. *Id.* at 307–08. The district judge denied the motion, relying on the officers' deposition testimony that they were present at the arrest and the plaintiff's deposition testimony that the arresting officers beat him. *Id.* at 308. That evidence, the judge determined, was enough to create a genuine factual dispute for trial about whether the three officers were involved in the beating. *Id.* at 307–08.

The Supreme Court held that the order was not immediately appealable because the judge did not rule on the officers' entitlement to qualified immunity; rather, the judge simply identified a disputed question of historical fact—whether the three officers participated in the beating—and denied the summary-judgment motion on that basis. *Id.* at 313–14. The Court explained that an order denying summary

judgment is not immediately appealable under the *Mitchell* rule to the extent that it "determines *only* a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Id.* at 313 (emphasis added). That kind of ruling, "though entered in a 'qualified immunity' case," is not a legal determination of the defendant's entitlement to immunity; it's just a garden-variety summary-judgment ruling about whether the evidentiary record shows a merits-related factual dispute for trial. *Id.* Because the judge held only that the evidentiary record "raised a genuine issue of fact concerning [the officers'] involvement in the alleged beating," the order did not determine the officers' entitlement to immunity and thus was not appealable under § 1291 and *Mitchell*. *Id.*

In *Plumhoff v. Rickard*, 572 U.S. 765 (2014), the Court explained the limited nature of *Johnson*'s holding. *Plumhoff* involved litigation against police officers who fired multiple shots at a fleeing car during a high-speed chase, killing the driver and passenger. *Id.* at 768–70. The driver's daughter sued, alleging that the officers used excessive force in violation of the Fourth Amendment. The entire episode was captured on video by the patrol car's dashboard camera; the video recording was in the record. *Estate of Allen v. City of W. Memphis*, No. 05-2489, 2011 WL 197426, at *1 (W.D. Tenn., Jan. 20, 2011). Based on a review of that evidence, the district judge rejected the officers' qualified-immunity defense at summary judgment. *Id.* at *10–11. The Sixth Circuit initially dismissed the officers' appeal for lack of appellate jurisdiction under *Johnson* but later changed course, vacated the dismissal order, and affirmed the judge's decision denying qualified immunity. *Plumhoff*, 572 U.S. at 770–71.

When the case reached the Supreme Court, the first issue for decision was the question of appellate jurisdiction. The Court began by reinforcing the important principle that because qualified immunity is an immunity from suit, not merely a defense to liability, pretrial orders denying qualified immunity are immediately appealable under the collateral-order doctrine. *Id.* at 771–72.

> This is so because such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action, and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost.

*Id.* at 772.

The Court then addressed and rejected the plaintiff's argument that *Johnson* foreclosed immediate review of the summary-judgment order. The order at issue in *Johnson* merely identified a dispute of historical fact about whether three of the defendant officers were actually involved in the beating; that kind of "evidence sufficiency" order "does not present a legal question in the sense in which the term was used in *Mitchell*." *Id.* The order in *Plumhoff*, the Court explained, was "nothing like the order in *Johnson*." *Id.* at 773. It did not simply identify a dispute of historical fact; the relevant evidence about the car chase and shooting was preserved on video and thus was not in dispute. And in contrast to *Johnson*, the defendant officers did "not claim that other officers were responsible for [the] shooting." *Id.*

"[R]ather, they contend[ed] that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law." *Id.* In other words, the officers admitted firing shots at the fleeing car but maintained that their conduct was a lawful response to the driver's danger-ous flight, and even if it was not, that a reasonable officer would not have clearly understood that the shooting was unlawful under the circumstances.

The Court thus concluded that the officers had "raise[d] legal issues [and] these issues [were] quite different from any purely factual issues that the trial court might confront if the case were tried." *Id.* Summing up its jurisdictional analy-sis, the Court emphasized that "deciding legal issues of this sort is a core responsibility of appellate courts." *Id.* The Court went on to hold that the officers' use of lethal force was a lawful response to the dangers posed by the driver's high-speed flight. *Id.* at 775–77. Alternatively, the Court held that qualified immunity shielded them from suit because a reasonable officer would not have clearly understood that using lethal force to end the chase was unconstitutional. *Id.* at 778–80.

*Plumhoff* controls here, not *Johnson*. The historical facts about what occurred before and during the shooting are preserved on video and are not disputed. In contrast to *Johnson*, Officers Finkley and Stahl admit that they, not other officers, fired the shots that injured Smith. And just like in *Plumhoff*, the officers argue that their use of force was a lawful response to the circumstances facing them, and even if it was not, that a reasonable officer would not have clearly understood that using deadly force in these circumstances was unconstitutional. All that remains is to apply the

qualified-immunity standard to the video-recorded evidence
and make a legal determination about the officers' entitle-
ment to immunity—that is, we need answer only the ques-
tion whether a reasonable officer would have clearly
understood that using lethal force in this situation was
unlawful. That's no less true here than it was in *Plumhoff*.

Indeed, the district judge did just that: he reviewed the
video recordings in light of the legal standards for excessive-
force claims and qualified immunity and determined that
the evidence "does not show" that the officers "perceived"
or "reasonably believed" that Smith had or was reaching for
a gun when they fired the shots that injured him.[1] Slightly
rephrased, the judge determined that a reasonable officer
faced with these circumstances would have known that
using deadly force was unlawful because Smith did not pose
an imminent threat of serious physical harm to others. The
judge accordingly held that "the officers are not entitled to
qualified immunity."

In short, the judge addressed and decided the paradig-
matic qualified-immunity question in a Fourth Amendment
case of this type: At the time of the shooting, would a rea-

---

[1] The judge's language is admittedly a bit imprecise. He framed the
qualified-immunity question by asking whether the evidence showed
that Officers Finkley and Stahl "perceived" or "reasonably believed" that
Smith had or was reaching for a gun and thus posed an imminent danger
to themselves or others. That's not quite the right way to frame the
question. Qualified-immunity analysis does not ask what *these officers*
perceived or believed but rather what the proverbial "reasonable officer"
would have understood about the lawfulness of his actions if faced with
these circumstances. Despite the imprecision, there's no doubt that the
judge made a legal ruling rejecting the officers' claims of qualified
immunity.

sonable officer have clearly understood that the use of deadly force in this situation was unlawful? As the Supreme Court underscored in *Plumhoff*, "deciding legal issues of this sort is a core responsibility of appellate courts." 572 U.S. at 773. For these reasons, *Johnson* does not apply. Appellate jurisdiction is secure under *Mitchell* and *Plumhoff*.

*     *     *

In reaching a contrary result, my colleagues hold that the officers' claims of qualified immunity cannot be resolved until a jury decides whether Smith posed an imminent threat to their safety or the safety of others during the ten-second period after they ascended the roof during this tense stand-off—or more specifically, in the four seconds immediately before the shooting when Smith gestured with empty hands, palms out at waist height, then began a downward movement reaching toward the ground behind the cube-shaped air conditioner. Majority op. at 19–26. Smith says he was surrendering. Officers Finkley and Stahl contend that he could have been reaching for a gun behind the air conditioner where their fellow officers told them he had been hiding. My colleagues conclude that this disagreement precludes appellate jurisdiction under *Johnson*.

Respectfully, that conclusion misapplies *Johnson* and well-established principles of qualified-immunity law. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In announcing the doctrine in *Harlow*, the Court explained that suits for dam-

ages against public officials carry significant social costs, including "the expense[] of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. On the other side of the scale, the Court recognized the importance of preserving a remedy against officials who abuse governmental power: "In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Id.*

To accommodate these competing interests, the Court held that public officials are qualifiedly immune from personal suit for damages in order "to shield them from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806. The immunity gives way, however, if the public official had fair notice at the time of his actions that the conduct in question was unlawful. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quotation marks and citation omitted).

The familiar test for overcoming qualified immunity thus has two parts: public officials are immune from suits for damages under 42 U.S.C. § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted). The second step of this framework

carries a specificity requirement: a public official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79.

The requirement of specificity sets a high bar for overcoming an assertion of immunity. It's not so strict that "a case directly on point" is necessary, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Put slightly differently, a right is clearly established *only* if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743). Qualified immunity thus "leaves 'ample room for mistaken judgments' by police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Immunity for reasonable mistakes "is especially important in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Excessive-force claims arise in an area of the law "in which the result de-

No. 20-1754                                            55

pends very much on the facts of each case." *Id.* at 13 (quotation marks omitted). Fourth Amendment claims require an objective analysis of the reasonableness of the officer's actions, *Graham v. Connor*, 490 U.S. 386, 397 (1989), and the test for evaluating the objective reasonableness of an officer's use of force "does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts," *Saucier*, 533 U.S. at 205 (discussing *Graham*). Accordingly, "qualified immunity protects actions in the 'hazy border between excessive and acceptable force.'" *Mullenix*, 577 U.S. at 18 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018).

Moreover, the *Graham* test for excessive-force claims is itself deferential to the judgment of police officers in the field. The reasonableness of a particular use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. So "in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event [that a] mistaken belief [about the use of force] was reasonable" under the circumstances. *Saucier*, 533 U.S. at 206. Accordingly, police officers get the benefit of the doubt—"a kind of double deference"—in excessive-force cases. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). The combined effect of the qualified-immunity standard and the substantive Fourth Amendment

standard protects them against suits arising from reasonable mistakes of fact or law.

Finally, it's important to note that under *Pearson*, 555 U.S. at 236, we have the discretion to skip the first step in the qualified-immunity framework and assume without deciding that a constitutional violation occurred (or that a jury might reasonably so conclude) and move directly to the second step in the analysis. Taking this approach has the virtue of focusing the court's attention on the decisive question: At the time of the challenged conduct and under the circumstances then confronting the officer, would "every 'reasonable official … understand that what he is doing' is unlawful"? *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court recently reminded us of the importance of this doctrinal flexibility: "[L]ower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Id.* at 589 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

Putting these principles together shows why the majority is wrong to think that the legal issue of qualified immunity cannot be decided until a jury determines whether Smith was surrendering and thus was not an imminent threat. Nothing turns on the answer to that question, not the merits of the Fourth Amendment claim and certainly not the claim of qualified immunity. The merits question—the objective reasonableness of the officers' actions—does not hinge on a finding that Smith was, or was not, surrendering. "Not all surrenders … are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Johnson v. Scott*, 576 F.3d 658, 659 (7th

Cir. 2009). The key question is whether it was objectively reasonable for the officers to interpret Smith's hand gesture and downward movement as a possible attempt to retrieve a gun from behind the air conditioner where he had been hiding.

As I have explained, there's no dispute of historical fact that stands as an impediment to deciding that question; the videos from the officers' body cameras show us exactly what happened. Based on the video evidence and the information known to the officers when they arrived at the scene, the situation was unquestionably tense, dangerous, and uncertain. Officers Finkley and Stahl were forced to make a split-second threat assessment. Unlike us (or a jury, for that matter), they had to interpret what Smith was doing in real time. We can play and replay the video recording, but the officers had less than four seconds to interpret Smith's ambiguous movement toward the ground behind the air-conditioning unit. Even if the officers misjudged the threat (as we know, in hindsight, that they did), a mistake of fact can be objectively reasonable under the circumstances and thus not a Fourth Amendment violation.[2]

---

[2] In the majority's view, the videos answer the "who, what, and where" questions but "do not fully capture the how and why." Majority op. at 37–38. On the contrary, the videos show *exactly* how Smith gestured with his hands—waist high, empty, palms open—and then began to move toward the ground. The body cameras captured the entire event, and there's no dispute about the authenticity or accuracy of the recordings. There's no material dispute about the *why* question either. There was no gun behind the air conditioner, as the officers learned immediately after the shooting, so they were in fact mistaken about why Smith was bending down. My colleagues are therefore wrong to characterize this appeal as "effectively ask[ing] us to resolve what happened on

No. 20-1754

Perhaps more importantly, however, under *Pearson* we can skip the first step in the qualified-immunity framework and proceed directly to the second step in the analysis. Even if we assume for present purposes that the shooting *was* an excessive use of force (or that a reasonable jury could so conclude), the officers remain protected by qualified immunity if their mistake in judgment about the lawfulness of their conduct was reasonable under the circumstances. So the key question is this: Would *every* reasonable officer have recognized that using lethal force was unlawful in this specific situation?

That's the core qualified-immunity inquiry, and it is a legal question for the court. But the majority does not address it, holding instead that we lack jurisdiction to review the judge's order denying the officers' claims of qualified immunity. Yet the majority also says, confusingly, that the qualified-immunity defense "remains preserved for a later ruling." Majority op. at 43. How can that be? The district judge ruled unambiguously that "the officers are not entitled

---

August 31, 2017, at approximately 1 p.m. on the roof of the parking garage behind 2905 West Wisconsin Avenue in Milwaukee." *Id.* at 42. We know every fact about what happened; it's on tape.

What remains for decision is whether the officers' misinterpretation of Smith's movement was a mistake that a reasonable officer might make, judged objectively from the standpoint of an officer who was forced to make a split-second threat assessment in the pressure of this highly uncertain moment, not 20/20 hindsight. Put slightly differently, the question is whether *every* reasonable officer would have recognized that Smith was *not* reaching for a gun. That's the heart of the qualified-immunity defense in this case, and it's a legal question for the court that needs no further factual development.

to qualified immunity."[3] The court's jurisdictional dismissal leaves that ruling undisturbed. So unless the judge changes his mind, the case will proceed to trial on the merits and the officers' claims of immunity will be irretrievably lost.

\*    \*    \*

There is no jurisdictional bar, as I have explained, so we may—indeed, must—decide the qualified-immunity question. Based on my review of the uncontroverted evidence, especially the body-camera videos, I would reverse and remand for entry of judgment for the officers based on qualified immunity.

The record includes the following undisputed evidence: Officers Ferrell and Wenzel responded to a "man with a gun" dispatch, and when they arrived at the scene, Smith—who matched the description in the dispatch—fled on foot. As he ran, he kept his left hand over his left pants pocket, appearing to hold an L-shaped bulky object in place. Based on their training and experience, the officers thought the bulky object was a gun and gave chase. Smith initially eluded them, ran down an alley, and climbed up a set of stairs onto a roof. Officers Ferrell and Wenzel caught up and found him hiding behind a waist-high, cube-shaped air conditioner on the roof (one of two). They took up secure positions on the stairs, pointed their guns at him, and repeatedly commanded him to show his hands and surrender.

---

[3] I disagree with my colleagues that the judge expressed his legal conclusion "somewhat imprecisely." *Id.* at 43. As I have explained, some of the judge's language is imprecise—notably, his articulation of the qualified-immunity standard—but his bottom-line ruling rejecting the defense is clear.

Smith did not comply. Rather, he peeked around the air conditioner, stood up, and began to pace around on the far side of the roof, refusing their continued commands to show his hands and give up.

Officers Finkley and Stahl responded to the "man with a gun" dispatch a few minutes behind Officers Ferrell and Wenzel. When they arrived at the stairs, they were told that the suspect was on the roof. As they climbed the stairs, Finkley asked if the suspect had a gun in his hand. Ferrell replied: "[H]e doesn't have a gun in his hand but he was hiding behind the AC unit." Officers Finkley and Stahl climbed onto the roof, guns drawn, and commanded Smith to put his hands in the air and turn around. Smith did not comply. Instead, he remained where he was beyond the two air-conditioning units, facing the officers with his hands down at his side. The officers moved toward him, continuing their commands to put his hands in the air. Then, immediately before the shooting, Smith made the ambiguous gesture that my colleagues say a jury must interpret: he stretched his hands out slightly, palms open at waist height, then began to lean forward and down toward the ground behind the air conditioner nearest him. The officers fired three shots in rapid succession, hitting Smith and causing serious injuries. Finkley fired the first and third shots; Stahl fired the second. Only ten seconds passed from the moment the officers ascended the roof to the end of the shooting. Smith's gesture and the three gunshots took just four seconds.

We know in hindsight that the officers misinterpreted Smith's gesture. He was not reaching for a gun behind the air conditioner. But their split-second mistake in judgment

was not unreasonable given the high-pressure, uncertain, and dangerous situation before them. It is not possible to say that every reasonable officer would have understood that Smith was not a threat and that using deadly force was therefore unconstitutional under the *Graham* standard.[4]

"It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect is indeed subdued." *Johnson*, 576 F.3d at 660 (citations omitted). The law does not require an officer to "take [an] apparent surrender at face value" if the circumstances leave "uncertainties in the situation that faced him." *Id.* at 660–61. Officers Finkley and Stahl had only a second or two to decide if Smith's movement meant that he was reaching for a gun or surrendering. An error in judgment could have cost them their lives. Given the uncertainties and fraught circumstances they faced, their mistake in judgment was one that a reasonable officer might make.

Qualified immunity protects officers from suits arising from their reasonable mistakes of fact and law—especially

---

[4] My colleagues say that they "do not derive certainty from the video depictions of the last four seconds before Smith was shot" because the events "preceding and during the shooting remain subject to interpretation." *Id.* at 41. That Smith's hand gesture and downward movement were ambiguous—i.e., "subject to interpretation"—supports the officers' claims of qualified immunity. Their split-second mistake in judgment does not expose them to trial and possible liability unless the court can say that *every* reasonable officer would have known that he was not reaching for a gun. If the majority is uncertain about how to interpret Smith's actions, then it's not possible to say that every reasonable officer would have recognized that he was not reaching for a gun.

62                                                    No. 20-1754

where, as here, the circumstances require a split-second
threat assessment in a tense "man with a gun" confrontation.
Officers Finkley and Stahl are entitled to qualified immunity.
Accordingly, I respectfully dissent.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## FINAL JUDGMENT

August 18, 2021

Before

DIANE S. SYKES, *Chief Judge*
MICHAEL B. BRENNAN, *Circuit Judge*
AMY J. ST. EVE, *Circuit Judge*

|  | JERRY SMITH, JR.,<br>Plaintiff - Appellee |
|---|---|
| No. 20-1754 | v. |
|  | MELVIN FINKLEY and ADAM STAHL,<br>Defendants - Appellants |
| **Originating Case Information:** | |
| District Court No: 2:18-cv-00143-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |

The appeal is **DISMISSED** for lack of jurisdiction, with costs, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**    (form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## NOTICE OF ISSUANCE OF MANDATE

September 9, 2021

To:  Gina M. Colletti
     UNITED STATES DISTRICT COURT
     Eastern District of Wisconsin
     Milwaukee, WI 53202-0000

| | |
|---|---|
| | JERRY SMITH, JR.,<br>            Plaintiff - Appellee |
| No. 20-1754 | v. |
| | MELVIN FINKLEY and ADAM STAHL,<br>            Defendants - Appellants |

| **Originating Case Information:** |
|---|
| District Court No: 2:18-cv-00143-LA |
| Eastern District of Wisconsin |
| District Judge Lynn Adelman |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                              No record to be returned

form name: **c7_Mandate**     (form ID: **135**)